R. Brent Wisner, Esq, (SBN: 276023)
rbwisner@wisnerbaum.com
Stephanie B. Sherman, Esq. (SBN: 338390)
ssherman@wisnerbaum.com
**WISNER BAUM, L.L.P**
11111 Santa Monica Boulevard, Suite 1750
Los Angeles, CA 90025
Telephone: (310) 207-3233
Facsimile: (310) 820-7444

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| GRACE NAVARRO and CHATHAM MULLINS, on behalf of themselves, and all others similarly situated, and the general public,<br><br>          Plaintiffs,<br><br>   v.<br><br>WALGREENS BOOTS ALLIANCE, INC. and DOES 1 to 50, Inclusive,<br><br>          Defendants. | Civil Action No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**CONSUMER FRAUD, BREACH OF EXPRESS & IMPLIED WARRANTIES, AND UNJUST ENRICHMENT**<br><br>**DEMAND FOR JURY TRIAL** |

# TABLE OF CONTENTS

Page

I.     INTRODUCTION ........................................................................................... 1

II.    THE PARTIES ............................................................................................... 5

III.   JURISDICTION AND VENUE ..................................................................... 6

IV.    GENERAL ALLEGATIONS .......................................................................... 6

    A.    WALGREENS DID NOT COMPLY WITH FDA'S TESTING
        REQUIREMENTS BEFORE SELLING THE PRODUCTS TO THE PUBLIC ........... 7

    B.    WALGREENS KNEW OR SHOULD HAVE KNOWN THE BPO PRODUCTS
        DEGRADED TO BENZENE UNDER NORMAL USE, HANDLING, AND
        STORAGE.................................................................................................. 8

    C.    WALGREENS KNEW OR SHOULD HAVE KNOWN BENZENE WAS
        FOUND IN OTHER CONSUMER PRODUCTS BUT DID NOT TEST ITS
        BPO PRODUCTS ...................................................................................... 11

    D.    WALGREENS IGNORED FDA'S BENZENE ALERT TO TEST BPO
        PRODUCTS ............................................................................................. 11

    E.    RECENT TESTING FOUND COMMON BPO PRODUCTS, INCLUDING
        WALGREENS' PRODUCTS, CONTAIN DANGEROUS LEVELS OF
        BENZENE IN EXCESS OF REGULATORY LIMITS ................................. 12

    F.    DEFENDANT EXPOSED PLAINTIFFS, THE CLASS, AND THE PUBLIC
        TO BENZENE, A KNOWN HUMAN CARCINOGEN, WITHOUT THEIR
        KNOWLEDGE........................................................................................... 17

    G.    WALGREENS CONCEALED FROM CONSUMERS ITS FAILURE TO TEST
        THE BPO PRODUCTS FOR SAFETY ....................................................... 20

    H.    WALGREENS DID NOT WARN CONSUMERS THE BPO PRODUCTS
        WERE AT RISK OF BENZENE CONTAMINATION ................................. 21

    I.    WALGREENS MARKETED AND SOLD BPO PRODUCTS AT RISK OF
        BENZENE CONTAMINATION TO CHILDREN AND TEENAGERS ................... 21

V.     PUNITIVE DAMAGES ALLEGATIONS....................................................... 22

VI.    PLAINTIFFS' SPECIFIC ALLEGATIONS .................................................. 23

VII.   CLASS ACTION ALLEGATIONS................................................................. 24

VIII.  CAUSES OF ACTION................................................................................... 28

A.    VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW Bus. & Prof. Code § 17200 *et seq.*, *on Behalf of the California Subclass* ............................ 28

B.    VIOLATION OF CALIFORNIA'S CONSUMER LEGAL REMEDIES ACT, Cal. Civ. Code § 1750, *et seq., on Behalf of the California Subclass* ......................... 30

C.    FALSE ADVERTISING UNDER VARIOUS STATE STATUTES, *Individually and on behalf of the California, Hawaii and New York Subclasses* ............................... 32

D.    DECEPTIVE TRADE PRACTICES UNDER VARIOUS STATE STATUTES, *Individually and on Behalf of the California, Connecticut, Hawaii, Illinois, Maryland, Massachusetts, Missouri, New York, Nevada, Pennsylvania, Ohio, Rhode Island, and Washington Subclasses* .................................................. 35

E.    BREACH OF EXPRESS WARRANTY, *Individually and on Behalf of the Nationwide Class and on Behalf of the California, Connecticut, Hawaii, Illinois, Maryland, Massachusetts, Missouri, New York, Nevada, Pennsylvania, Ohio, Rhode Island, and Washington State Subclasses* ........................................... 38

F.    BREACH OF IMPLIED EXPRESS WARRANTY, *Individually and on Behalf of the Nationwide Class and on Behalf of the California,* Hawaii, *Illinois, Maryland, Massachusetts, Missouri, New York, Nevada, Pennsylvania, Ohio, Rhode Island, and Washington Subclasses* ........................................................................... 39

G.    UNJUST ENRICHMENT, *Individually and on Behalf of the Nationwide Class and on Behalf of the California, Hawaii, Illinois, Maryland, Massachusetts, Missouri, New York, Nevada, Pennsylvania, Ohio, Rhode Island, and Washington Subclasses* .............................................................................. 41

IX.    **PRAYER FOR RELIEF** ............................................................................. **41**

X.    **DEMAND FOR JURY TRIAL** .................................................................. **42**

Plaintiffs, GRACE NAVARRO and CHATHAM MULLINS, on behalf of themselves, the proposed Class and Subclasses (defined below), and the public, brings this Class Action Complaint ("Class Action") against Defendant, alleging the following upon Plaintiffs' personal knowledge, or where Plaintiffs lack personal knowledge, upon information and belief, including the investigation of counsel.

## I.  INTRODUCTION

1.    This is a consumer fraud Class Action to redress the economic harms caused by Defendant's sale of benzoyl peroxide acne treatment drug products ("BPO Products" or "Products") without warning consumers the BPO Products had unsafe levels of the potent human carcinogen benzene, and that the BPO Products were at risk of degrading further into benzene under normal use, handling, and storage conditions.

2.    The BPO Products are "drugs" used to treat acne vulgaris ("acne"), formulated with a chemical called benzoyl peroxide ("BPO"), along with other inactive ingredients, to make acne treatment creams, washes, scrubs, and bars. Before being sold to the public, the Products must be made in conformity with current good manufacturing practices and must conform to quality, safety, and purity specifications. Defendant's BPO Products did not.

3.    BPO Products should not have benzene, nor degrade into benzene, except under extraordinary circumstances.[1] A drug is "adulterated" if it consists in whole or in part of any filthy, putrid, or decomposed substance, is impure, or mixed with another substance.[2]  Under the Federal Food, Drug and Cosmetic Act, it is a crime to introduce or deliver "into interstate commerce any food, drug, device, tobacco product, or cosmetic that is adulterated or misbranded."[3] If benzene is found in any on-market or post-market Product, the drug is adulterated, unlawful and the drug manufacturer must contact the Food and Drug Administration ("FDA") initiate a voluntary recall.[4]

---

[1] Food and Drug Administration, *Q3C – Tables and List Guidance for Industry* (2017), https://www.fda.gov/media/71737/download.
[2] 21 U.S.C. § 351(a)(2011); *see also* § 351(b)-(d) (noting that a lack of purity or mixture with another substance also renders drug adulterated).
[3] 21 U.S.C. § 331(a)(2011).
[4] Food and Drug Administration. (Dec. 22, 2022). *FDA Alerts Drug Manufacturers to the Risk of Benzene in Certain Drugs,* https://www.fda.gov/drugs/pharmaceutical-quality-resources/fda-alerts-drug-manufacturers-risk-benzene-contamination-certain drugs (last visited Feb. 9, 2024).

4.    Throughout this Complaint, references to federal law and FDA regulation are merely to provide context and are not intended to raise a federal question of law. All claims alleged herein arise out of violations of state law, which in no way conflict, interfere with, or impose obligations that are materially different than those imposed by federal law.

5.    The BPO Products marketed and sold by Defendant decomposed into benzene rendering them materially different than advertised, *i.e.*, by containing unsafe levels of benzene. Benzene is a known human carcinogen. Studies dating to the 1800s have led to a consensus within the medical and scientific communities that benzene exposure, even in low amounts, increases the risk of blood cancers and other adverse effects.

6.    In 2023, Valisure, LLC,[5] an independent, accredited laboratory that has developed analytical methods to test drugs and consumer products for public safety, tested a representative sample of BPO and non-BPO products and found the BPO Products had dangerous levels of benzene, many multiple times higher than allowed in any regulated drug.[6] Using industry standard gas chromatography and detection by mass spectrometry ("GC-MS") instrumentation, with selected ion flow tube mass spectrometry ("SIFT-MS") for detection of benzene released into the air around certain BPO Products, the Products were incubated to temperatures common during consumer use, handling, and storage and sampled for benzene.[7] Levels as high as 1600 parts per million (ppm) were found in Defendant's Product, 2.5% Cream.[8] Unexpectedly, researchers found that benzene was

_____

[5] Valisure is an independent third-party analytical laboratory that is accredited to International Organization for Standardization ("ISO/IEC") 17025:2017 standards for chemical testing (PJLA Accreditation Number 94238). In response to rising concerns about drug shortages, generics, and overseas manufacturing, Valisure developed and validated methods to test medications and consumer products distributed in the United States. Valisure has tested a variety of drug and consumer healthcare products for benzene including sunscreens, antiperspirants, body sprays, hand sanitizers, and dry shampoos for benzene. Valisure's testing results submitted to the FDA in its Citizen's Petitions, were widely publicized in the media leading to numerous recalls of contaminated consumer products. *See* Valisure Citizen's Petition on Benzoyl Peroxide (March 4, 2024), pp. 6-7, *see also* Valisure Detects Benzene in Sunscreen, https://www.valisure.com/valisure-newsroom/valisure-detects-benzene-in-sunscreen; Bruce Y. Lee, Forbes, FDA: P&G Recalls Antiperspirant Sprays Due To Cancer Risk Of Benzene (Nov. 24, 2021), https://www.forbes.com/sites/brucelee/2021/11/24/fda-pg-recalls-antiperspirants-body-sprays-due-to-cancer-risk-of-benzene/?sh=69cf13c24f32; *see also* Sandee LaMotte, CNN, Antiperspirant recall: What the finding of a cancer-causing chemical means for you (Dec. 1, 2021), https://www.cnn.com/2021/12/01/health/deodorants-antiperspirants-recall-benzene-explainer-wellness/index.html.
[6] Valisure FDA Citizen's Petition on Benzoyl Peroxide (March 6, 2024).
[7] *Id.*
[8] *Id.* at 17.

1  released into the surrounding air outside the Products' containers even when the packaging and

2  containers were closed raising concern for even more inhalation exposures—a particularly pernicious

3  form of exposure to benzene.[9] For the non-BPO products tested, benzene was not present, or at trace

4  levels below 2 ppm.[10]  Valisure filed a FDA Citizen's Petition on March 5, 2024 demanding an

5  immediate recall of all BPO Products.[11] The Petition is pending.[12]

6        7.      The high levels of benzene found led Valisure to conduct a stability study on a diverse

7  market sweep of BPO Products and formulations. Valisure's results show that on-market BPO

8  Products can form over 800 times the conditionally restricted FDA concentration limit of 2 ppm for

9  benzene, and the evidence suggests this problem applies broadly to BPO Products currently on the

10  market.[13] Valisure concluded that on-market BPO Products appear to be fundamentally unstable and

11  form unacceptably high levels of benzene when handled or stored at temperatures the Products will be

12  exposed to during expected use and handling by consumers.[14]

13        8.      Although the BPO Products have been found to have benzene, Defendant never listed

14  benzene among the its Products' ingredients, or anywhere on the Products' labels, containers,

15  advertising or on Defendant's websites. Defendant never warned anyone the Products had benzene or

16  were at risk of benzene contamination.

17        9.      Defendant knew or should have known its BPO Products contain and/or degraded into

18  benzene when exposed to expected consumer use, handling, and storage conditions. BPO is known,

19  within the scientific community (but not among consumers) to degrade into benzene according to the

20

21

22  [9] *Id.* at 23.

23  [10] *Id.* at 15 ("76 non-BPO products had no detectable benzene or values below 0.1ppm. 6 non-BPO products
contained traces of benzene below 2 ppm, which could be due to various inactive ingredients used in consumer
products that have been theorized to contain trace benzene"); *see also* Valisure, LLC,

24  https://www.valisure.com/valisure-newsroom/valisure-detects-benzene-in-benzoyl-peroxide (last visited March
6, 2024).

25  [11] Valisure's Citizen Petition on Benzene in Benzoyl Peroxide Products (March 5, 2024), *available at*:
https://www.valisure.com/valisure-newsroom/valisure-detects-benzene-in-benzoyl-peroxide (last visited March

26  7, 2024).

[12] Valisure's Citizen's Petition was still pending as of this Class Action's filing.

27  [13] Valisure, LLC, (March 6, 2024), *Valisure Discovers Benzoyl Acne Treatment Products are Unstable and
Form Benzene,* https://www.valisure.com/valisure-newsroom/valisure-detects-benzene-in-benzoyl-peroxide

28  (last visited March 6, 2024).

[14] *Id.*

3

CLASS ACTION COMPLAINT

mechanism below:[15]



10.    Defendant misled the Plaintiffs, the putative Classes, and the public by representing its BPO Products only had the ingredients listed on the labels, packaging, containers, and on its website. Defendant misled the Plaintiffs, the putative Classes, and the public by representing the BPO Products were safe while concealing material health and safety information known to them, *e.g.*, that the BPO Products degraded to benzene, or were contaminated with benzene. Defendant misled Plaintiffs, the putative Classes, and the public by giving the BPO Products long expiration dates of 2-3 years, leading consumers to believe the Products were safe for use for years when Defendant knew or should have known the Products degraded into benzene much sooner and were likely already contaminated by the time the Products were first used by the consumer.

11.    Defendant's statements and omissions of material health and safety information are prohibited deceptive trade practices and false and deceptive advertising. Defendant's statements about the Products were false, misleading, unsubstantiated, untruthful, and blatantly deceptive.  Even more egregious was Defendant unreasonably placed Plaintiffs, the California Class, and the public at risk of exposure to benzene, and at increased risk of cancer, without their knowledge and consent.

12.    Because of the Defendant's misconduct and consumer deception, the Plaintiffs and the

---

[15] The disposition of benzoyl peroxide to form benzene. Benzoyl peroxide is known to thermally decompose to form two molecules of benzoyloxy radicals that can further decompose to benzoic acid or phenyl radicals with liberation of carbon dioxide. The phenyl radicals can then produce benzene.  *See* Shang-Hao Liu,  et al, *Thermal hazard evaluation of the autocatalytic reaction of benzoyl peroxide using DSC and TAM III*, THERMOCHIMICA ACTA, Volume 605, Pages 68-76, , (2015), ISSN 0040-603, https://www.sciencedirect.com/science/article/pii/S004060311500057X.

CLASS ACTION COMPLAINT

putative Classes were economically harmed, as they bought Products they otherwise would have never bought. They were also physically harmed by being exposed to a known human carcinogen.

13.     This Class Action is necessary to redress the economic harms caused to the Plaintiffs and Class members who bought the Products believing them to be safe. This Class Action is further necessary to expose Defendant's ongoing consumer fraud and to enjoin Defendant from continuing their misconduct to protect consumers and the public.

14.     Plaintiffs bring this Class Action individually, and on behalf of those similarly situated, and seek to represent a California Class of consumers who bought the Products. Plaintiffs seek damages, reasonable attorneys' fees and costs, interest, restitution, and all other equitable relief, including an injunction and disgorgement of all benefits and profits Defendant received from their misconduct.

## II.  THE PARTIES

15.     Plaintiff Grace Navarro is a California resident, located in Fresno County, who bought BPO Products including Walgreens' Maximum Strength Acne Foaming Wash for her pores and breakouts and used it from June 2022 to September 2022. Plaintiff has suffered economic damages and a result of Defendant's violations of the state laws alleged herein. Plaintiff would never have purchased Defendant's BPO Products had Defendant warned about the presence of benzene or that the Products could degrade into benzene.

16.     Plaintiff Chatham Mullins is a Massachusetts resident, located in Suffolk County, who bought BPO Products including Walgreens' Daily Creamy Benzoyl Peroxide Acne Face Wash for her acne blemishes and used it from 2005 to 2023. Plaintiff has suffered economic damages and a result of Defendant's violations of the state laws alleged herein. Plaintiff would never have purchased Defendant's BPO Products had Defendant warned about the presence of benzene or that the Products could degrade into benzene.

17.     Defendant Walgreens Boots Alliance, Inc. ("Walgreens") is a citizen of Illinois and Delaware with its principal place of business in Deerfield, Illinois.  Walgreen's Products include, inter alia: (1) Daily Creamy Benzoyl Peroxide Acne Face Wash and (2) Maximum Strength Acne Foaming Wash. At all relevant times, Walgreens conducted business and derived substantial revenue from its

manufacturing, advertising, marketing, distributing, and selling of the Products within the State of California.

18.    Defendant and its agents promoted, marketed, and sold the Products in California and in this District. The unfair, unlawful, deceptive, and misleading advertising and labeling of the Products were prepared and/or approved by Defendant and its agents and were disseminated by Defendant and its agents through statements, labeling, and advertising containing the misrepresentations alleged and disseminated uniformly to Plaintiffs and the Subclass members through Defendant's advertising, packaging, containers, and via its websites and social media.

### III.  JURISDICTION AND VENUE

19.    This Court has jurisdiction over this matter because the amount in controversy exceeds $5 million satisfying 28 U.S.C. § 1332(d)(2) for subject matter jurisdiction. This Court has supplemental jurisdiction over any state law claims under 28 U.S.C. § 1367.

20.    Venue is proper in the Eastern District of California under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this District.

21.    This Court has personal jurisdiction over the Defendant because Defendant transacts business in California, including in this District, has substantial aggregate contacts with the State of California and in this District, engaged in misconduct that has and had a direct, substantial, reasonably foreseeable, and intended effect of injuring people in California and in this District, and Defendant purposely availed itself of the benefits of doing business in California, and in this District. Moreover, Plaintiffs' claim arises out of and relates to the Defendant's actions and contacts with the State of California.

22.    To the extent applicable, the Court also has pendant personal jurisdiction over claims alleged against Defendant that involve the same common nucleus of facts and actions that give rise to Plaintiffs' claims that otherwise have proper personal jurisdiction within this Court.

### IV.  GENERAL ALLEGATIONS

23.    Fifty million Americans suffer from acne annually.[16] Acne is the most common skin

---

[16] American Association of Dermatology, https://www.aad.org/media (visited October 24, 2023).

condition in the United States with a prevalence among adolescents of almost 95 percent.[17] Acne can begin as early as age seven and, for some, can persist through adulthood and into ages 50s and 60s.[18] Millions of acne sufferers seek treatment every year making it a billion-dollar industry and a key business segment for Defendant Walgreens, who sells BPO Products under its private label.

24.    Defendant Walgreens dominates the drug and consumer health care products' markets year after year and is among America's top Fortune 50 publicly traded companies.  Walgreens markets itself as a pharmacy and retail leader serving millions of customers and patients every day, with a 170-year heritage of caring for communities.[19]  Walgreens claims it is a trusted, global innovator in retail pharmacy with approximately 13,000 locations across the U.S., Europe, and Latin America. Defendant earned 139.1 billion dollars during fiscal year 2023.[20] Walgreens heavily markets its commitment to environmental concerns stating it is determined to protect the planet through internal programs and by engaging suppliers on environmental issues to reduce emissions and waste and were committed to sustainability and lessening its environmental impact.[21]

A.    **WALGREENS DID NOT COMPLY WITH FDA'S TESTING REQUIREMENTS BEFORE SELLING THE PRODUCTS TO THE PUBLIC**

25.    Despite its public affirmations of concern for consumers Walgreens did not adequately test its BPO Products before selling them to the public. Defendant's BPO Products are "drugs" regulated by the FDA. As with any regulated drug, Defendant must follow current good manufacturing practices ("CGMPs"), have scientifically sound specifications, and must have test procedures and processes to ensure the drug's components (active and inactive ingredients), and finished products are safe. Both raw ingredient materials and finished batches must be tested before released to the public to confirm they meet specifications for identity, strength, quality, and purity.[22]

---

[17] JL Burton et al., *The prevalence of acne vulgaris in adolescence*, BR J DERMATOL,(1971);85(2):119–126.
[18] *Id.*
[19] Walgreens Alliance Boots, Inc,  https://www.walgreensbootsalliance.com/ about-us.
[20] Press Release. Walgreens Boots Alliance, Inc. (Oct. 12, 2023). *Walgreens Boots Alliance, Inc. Fiscal Year 2023 Earnings*,  https://www.walgreensbootsalliance.com/ news-media/press-releases/2023/walgreens-boots-alliance-reports-fiscal-year-2023-earnings (visited November 1, 2023).
[21] Walgreens Boots Alliance, Inc. *Environmental, Societal, & Governance,* https://www.walgreensbootsalliance.com/environmental-social-governance/healthy-planet (last visited November 1, 2023).
[22] 21 C.F.R. § 211.84 (1978); *see also* 21 C.F.R. § 211.160 (1978).

7
CLASS ACTION COMPLAINT

1    If testing results of the raw materials or finished product do not conform with the specifications, the

2    product cannot be sold to the public.  Defendant must also re-test any Products subject to

3    deterioration.[23]  Any Products not made in conformity with the CMGPs is considered "adulterated"

4    under 501(a)(2)(B) of the Food, Drug, and Cosmetic Act.[24]

5           26.    Defendant must also do stability testing to understand the "shelf life" of the Products

6    and to assign an expiration date. It is well known that certain chemical ingredients can degrade or

7    change because of environmental, and storage conditions such as light, moisture, temperature, and

8    humidity, or because of the passage of time. The stability testing should cover all expected distributor

9    and consumer storage, handling, and use conditions and must be done using "reliable, meaningful, and

10   specific test methods."[25] If stability testing finds a drug product is not stable under expected storage or

11   use conditions, degrades, or create toxic byproducts, the product cannot be sold to the public.

12          27.    The CGMPs and stability test requirements are there to ensure drug products are safe

13   for public use. These are the minimum requirements. Because the drug manufacturers are largely self-

14   regulated, the FDA must rely on drug manufacturers, the public, and concerned citizens to report

15   unsafe drugs. The FDA cannot force a drug manufacturer to recall a contaminated drug.[26]

16   **B.    WALGREENS KNEW OR SHOULD HAVE KNOWN THE BPO PRODUCTS
17         DEGRADED TO BENZENE UNDER NORMAL USE, HANDLING, AND
           STORAGE**

18

19          28.    Defendant knew or should have known the BPO Products degrade to benzene when

20   exposed to heat. Defendant knew that, because of the chemical nature of the active and inactive

21   ingredients, including BPO, the BPO Products were not stable and would degrade when exposed

22   normal and expected use, handling, and storage conditions.

23   ───────────────
     [23] 21 C.F.R. § 211.160(b)(1)(1978).

24   [24] 21 C.F.R. § 225.1 (1976). Under 501(a)(2)(B) of the Federal Food, Drug, and Cosmetic Act a drug is
     considered "adulterated" (poorer in quality by adding another substance) if the methods used in, or the facilities
25   or controls used for, its manufacture, processing, packing, or holding do not conform to or are not operated or
     administered in conformity with CGMP; *see also* Food and Drug Administration, *Facts About the Current
26   Good Manufacturing Practices (CGMP);* https://www.fda.gov/drugs/pharmaceutical-quality-resources/facts-
     about-current-good-manufacturing-practices-cgmp (last visited Feb. 11, 2024).
27   [25] 21 CFR 211.166.

     [26] Food and Drug Administration, *Facts About the Current Good Manufacturing Practices (CGMP);*
28   https://www.fda.gov/drugs/pharmaceutical-quality-resources/facts-about-current-good-manufacturing-
     practices-cgmp (last visited Feb. 11, 2024).

29.     It is well known that BPO degrades to benzene when exposed to heat over time. This process was first reported in the scientific literature as early as 1936.[27] BPO degrades into benzene according to the mechanism below.[28]



30.     The degradation of BPO to benzene was known or should have been known to the Defendant, who promote themselves as expending substantial sums of money and resources to science and research. Defendant marketed themselves as mass merchandisers of quality drug and healthcare products.  Defendant employed high-level scientists, chemists, and researchers to formulate and/or decide which drug products it will privately label and sell for public use. Defendant with these resources and expertise were aware of the well-known chemical processes that degrade their BPO Products into benzene when exposed to common use temperatures and conditions.

31.     Defendant further knew or should have known that specific ingredients derived from hydrocarbons increased the risk the BPO Products would yield benzene.[29] At-risk ingredients include carbomers, mineral spirits, and other petroleum derived substances. These ingredients are red flags for risk of benzene contamination. The FDA published guidance in 2022 urging the industry to

---

[27] H. Erlenmeyer and W. Schoenauer, *Über die thermische Zersetzung von Di-acyl-peroxyden,* HELU. CHIM. ACTA, 19, 338 (1936), https://onlinelibrary.wiley.com/doi/10.1002/hlca.19360190153 (last visited Feb. 5, 2024).

[28] Benzoyl peroxide is known to thermally decompose to form two molecules of benzoyloxy radicals that can further decompose to benzoic acid or phenyl radicals with liberation of carbon dioxide. The phenyl radicals can then produce benzene.  *See* Shang-Hao Liu et al.,, *Thermal hazard evaluation of the autocatalytic reaction of benzoyl peroxide using DSC and TAM III,* THERMOCHIMICA ACTA, Volume 605, (2015), Pages 68-76, ISSN 0040-6031, https://www.sciencedirect.com/science/article/pii/S004060311500057X (last visited Feb. 5, 2024).

[29] Food and Drug Administration. (Dec. 22, 2022). *FDA Alerts Drug Manufacturers to the Risk of Benzene in Certain Drugs.*

9

CLASS ACTION COMPLAINT

reformulate drug products at risk of benzene contamination.[30]  The FDA's alert highlighted ingredients made from hydrocarbons, including carbomers (thickening agents), urging drug manufacturers to test products containing them for benzene contamination.[31] Many BPO Products have hydrocarbons and carbomers but none have been recalled due to benzene contamination.

32.     Defendant knew or should have known through their own research, development, formulation, evaluation, selection, and testing of BPO Products whether they were chemically and physically stable. Defendant was required not only to adequately test the BPO Products for safety and stability before selling them to the public, but also to monitor their internal practices, processes, and specifications to make sure they kept pace with science and emerging methodologies.  Defendant knew or should have known from expiration and stability studies examining the "shelf life" of the BPO Products, the chemical changes took place because of normal and expected environmental, use, and storage conditions.

33.     Defendant knew or should have known the BPO Products would be handled, used, and stored by distributors, sellers, and consumers under various temperatures that affect chemical stability. Defendant knew or should have known the BPO Products would travel by commercial carriers and distributors in varying storage conditions and would be stored by consumers in handbags, backpacks, bathrooms, showers, lockers, and in vehicles during warm months where the BPO Products would be exposed to heat. Defendant knew or should have known consumers would apply the benzene contaminated BPO Products to their faces and bodies and would also use the BPO Products in heated showers as scrubs and washes. Defendant knew or should have known the BPO Products would be used and applied to the skin at normal body temperatures, and elevated temperatures following showers or baths, after physical activity, and after the BPO Products sat in warm temperatures or hot vehicles.

34.     These storage, use, and handling conditions were known or should have been known to Defendant before the BPO Products were marketed and sold to Plaintiffs, the Class, and Subclass

---

[30] Food and Drug Administration. *Reformulating Drug Products That Contain Carbomers Manufactured With Benzene* (December 27, 2023), https://www.fda.gov/regulatory-information/search-fda-guidance- documents/reformulating-drug-products-contain-carbomers-manufactured-benzene.
[31] *Id; see also* December 22, 2022 FDA Alert at 1.

CLASS ACTION COMPLAINT

1  members. Defendant knew or should have known the BPO Products degrade to benzene under these

2  conditions exposing consumers to benzene. Defendant further knew or should have known that,

3  because of the known degradation of BPO to benzene, their BPO Products were contaminated with

4  benzene by the time they reached consumers, but they sold them to Plaintiffs, the Class, the Subclass,

5  and the public anyway, without warning of the risk of exposure. Moreover, the 2–3-year shelf life

6  printed on the BPO Products told consumers they were safe for use for years, when they were not.

7  **C.    WALGREENS KNEW OR SHOULD HAVE KNOWN BENZENE WAS FOUND
         IN OTHER CONSUMER PRODUCTS BUT DID NOT TEST ITS BPO**

8  **PRODUCTS**

9       35.    Defendant was aware or should have been aware of benzene contamination in other on-

10  market drug and healthcare products when they marketed and sold the BPO Products to Plaintiffs, the

11  Class, the Subclass, and the public but did not test the BPO Products for benzene contamination.

12       36.    In 2020, the FDA started working with companies to identify benzene in products,

13  which resulted in product recalls of hand sanitizers, sunscreens, and deodorants.  In 2021, an

14  independent chemical analysis by Valisure of hundreds of sunscreens and after-sun care products from

15  69 brands found 27 percent of the batches had significant levels of benzene above the FDA 2 ppm

16  limit.[32] Johnson and Johnson's Aveeno and Neutrogena sunscreen lines sold by Target were among

17  the most benzene contaminated products and were recalled.[33]  CVS's private brand after-sun care

18  products were also highly contaminated with benzene.  By 2021, Defendant was well aware of

19  benzene contamination issues in its competitor's products but ignored the reports and continued to

20  advertise and sell the BPO Products without testing them for benzene.

21  **D.    WALGREENS IGNORED FDA'S BENZENE ALERT TO TEST BPO
         PRODUCTS**

22

23       37.    In 2022, the FDA issued a safety alert warning drug manufacturers of the risk of

24  benzene contamination in certain drug products and drug components. The FDA reiterated the risk

25  benzene exposure poses to public health and the drug manufacturers' obligations to test drug products

26

27  [32] Valisure Citizen Petition on Benzene in Sunscreen and After-sun Care Products, May 24, 2021.

28  [33] Press Release. (July 14, 2021), Johnson & Johnson Consumer Inc.  Johnson & Johnson Consumer Inc.
   *Voluntarily Rec of Specific Neutrogena and Aveeno Aerosol Sunscreen Products Due to the Presence of
   Benzene.*

under the U.S. Code of Federal Regulations, Title 21:

> FDA reminds manufacturers they are required to establish scientifically sound and appropriate specifications and test procedures to assure drug components (active and inactive ingredients) and finished drug products conform to appropriate quality specifications (21 C.F.R. 211.84, 21 C.F.R. 211.160). This includes testing of raw materials and finished batches (21 C.F.R. 211.165) prior to release to ensure they meet appropriate specifications for identity, strength, quality, and purity.[34]

38.    The FDA warned drug manufacturers that any drug products or components at risk of benzene contamination should be tested, and any batches with benzene above 2 ppm should not be released to the public.[35]  The FDA further warned that, if any drug or drug component was subject to deterioration, drug manufacturers must have re-testing procedures in place to ensure continued purity and stability.  The FDA recommended risk assessments to evaluate the possibility of benzene contamination in the drug products or components.[36]  If any drug product in circulation was found to have benzene over 2ppm, the FDA directed that drug manufacturers contact the FDA to discuss a voluntarily recall.[37]

39.    To date, none of the Defendant's Products have been recalled due to benzene contamination.

**E.    RECENT TESTING FOUND COMMON BPO PRODUCTS, INCLUDING WALGREENS' PRODUCTS, CONTAIN DANGEROUS LEVELS OF BENZENE IN EXCESS OF REGULATORY LIMITS**

40.    Testing by Valisure in 2023 found common acne treatment products formulated with BPO are not only contaminated with benzene but have levels dangerous to public health. Valisure is an accredited independent laboratory who has developed validated analytical methods[38] to test drugs and consumer products to address rising concerns about public safety. Valisure has tested a wide variety of drugs and products for benzene including sunscreens, antiperspirants, hand sanitizers, and dry shampoos. Their work has led to widely publicized product recalls protecting the public from

---

[34] Federal Drug Administration. (Dec. 22, 2022). *FDA Alerts Drug Manufacturers to the Risk of Benzene in Certain Drugs,* 1.
[35] *Id.*, 3.
[36] *Id.*
[37] *Id.*, 2.
[38] Valisure's test methods largely mirror those utilized by FDA's own "Drug Quality Sampling and Testing" ("DQST") Program. Valisure FDA Citizen's Petition at 4.

1    dangerous and carcinogenic consumer products.[39]

2        41.    In 2023, Valisure tested 175 finished acne treatment products to determine whether any

3    had benzene.  Of the 175 products tested, 99 were formulated with BPO, 58 had active ingredients

4    (either individually or in combination) of salicylic acid, sulfur, adapalene, azelaic acid, niacinamide

5    and zinc, and 18 had no drug ingredients.[40] 83 of the BPO Products were purchased over the counter

6    from major retailers and 16 were prescription products purchased from licensed wholesalers.[41] The

7    BPO Products included popular Products: Proactiv 2.5% BPO Cream, Target Up & Up 2.5% BPO

8    Cream, Equate Beauty 10% BPO Cream, Equate BPO Cleanser, Neutrogena 10% BPO Cleanser,

9    Clearasil 10% BPO Cream, CVS Health 10% BPO Face Wash, Walgreens 10% BPO Cream, La

10   Roche Posay BPO Cream, and Clean & Clear 10% BPO Lotion.

11       42.    Valisure used three incubation temperatures to evaluate the effects of common

12   distributor and consumer use, handling, and storage conditions on benzene formation. 37°C/98.6°F

13   was used for human body temperature, 50°C/122°F was used to evaluate shelf-life performance as an

14   accelerated stability testing temperature used by the pharmaceutical industry, [42] and 70°C/158°F to

---

[39] *See* Valisure May 24, 2021 Citizen Petition on Benzene in Sunscreen and After-sun Care Products, https://www.valisure.com/valisure-newsroom/valisure-detects-benzene-in-sunscreen); Valisure's Citizen Petition on Hand Sanitizer Products Containing Benzene Contamination (filed March 24, 2021), https://www.regulations.gov/document/FDA-2021-P-0338-0001), Valisure's Citizen Petition on Benzene in Sunscreen and After-sun Care Products (filed May 24, 2021), https://www.regulations.gov/document/FDA-2021-P-0497-0001), Valisure's Citizen Petition on Benzene in Body Spray Products (filed November 3, 2021), https://www.regulations.gov/document/FDA-2021-P-1193-0001), Valisure's Citizen Petition on Benzene in Dry Shampoo Products (filed October 31, 2022),  https://www.regulations.gov/document/FDA-2022-P-2707-0001) *see also* CNET, Dry Shampoo Recall: What Is Benzene and Which Brands Are Affected https://www.cnet.com/health/personal-care/dry-shampoo-recall-what-is-benzene-and-which-brands-are-affected/ (identifying 19 types of dry shampoo have been recalled due to benzene content); Ryan Basen, Medpage Today, After Valisure Petition, Ol' Dirty Benzene Forces Another Recall (November 30, 2021), https://www.medpagetoday.com/special-reports/exclusives/95929 ("After Valisure Petition, Ol' Dirty Benzene Forces Another Recall"); Bruce Y. Lee, Forbes, FDA: P&G Recalls Antiperspirant Sprays Due To Cancer Risk Of Benzene (Nov. 24, 2021),  https://www.forbes.com/sites/brucelee/2021/11/24/fda-pg-recalls-antiperspirants-body-sprays-due-to-cancer-risk-of-benzene/?sh=69cf13c24f32; *see also* Sandee LaMotte, CNN, Antiperspirant recall: What the finding of a cancer-causing chemical means for you (Dec. 1, 2021), https://www.cnn.com/2021/12/01/health/deodorants-antiperspirants-recall-benzene-explainer-wellness/index.html.

[40] *See* Valisure Citizen's Petition on Benzoyl Peroxide (March 4, 2024).

[41] *Id.*

[42] Ghimire, Prakash et al., *Guidelines on Stability Studies of Pharmaceutical Products and Shelf Life Estimation.* INTERNATIONAL JOURNAL OF ADVANCES IN PHARMACY AND BIOTECHNOLOGY, (2020). 06. 15-23. 10.38111/ijapb.20200601004.

model storage in a hot vehicle.[43]  The BPO Products were incubated at 37°C for four weeks and 50°C for three weeks and benzene concentration was measured at certain time intervals using GC-MS. Benzene findings were plotted in real time and reported in parts per million ("ppm"). The results below were submitted to the FDA in Valisure's March 5, 2024 Citizen's Petition on Benzoyl Peroxide.[44]

**4A**



**4B**



[43] Grundstein A, Meentemeyer V, Dowd J. *Maximum vehicle cabin temperatures under different meteorological conditions.* Int J Biometeorol. 2009 May;53(3):255-61. doi: 10.1007/s00484-009-0211-x. Epub 2009 Feb 21. PMID: 19234721.

[44] Valisure, LLC, (March 6, 2024), *Valisure Discovers Benzoyl Acne Treatment Products are Unstable and Form Benzene,* https://www.valisure.com/valisure-newsroom/valisure-detects-benzene-in-benzoyl-peroxide (last visited March 6, 2024).

**4C**



**4D**



**4E**



**4F**



**4G**



**4H**



43.    Valisure found the BPO formulated products were not chemically stable and yielded benzene at levels well over 2 ppm, the maximum amount allowed in any U.S. regulated drug. Some of the benzene levels were 800 times higher than 2 ppm reaching as high as 1700 ppm.[45] The

---

[45] *Id.*

16

CLASS ACTION COMPLAINT

concentration of BPO in the Products did not influence the benzene levels, e.g., Target's Up & Up BPO Lotion and Proactiv's 10% BPO Cream yielded similar benzene results in the range of 600 ppm. Unexpectedly, Valisure found that benzene vapors leaked from some of the tested Products' packaging contaminating the surrounding air even when the packaging was closed raising concern for additional inhalation exposures.[46]

44.    Valisure concluded that all on-market BPO acne formulations are fundamentally unstable and form unacceptably high levels of benzene under normal use, handling, and storage temperatures, but no such evidence was observed for acne treatment products not formulated with BPO.[47]  The finding that additional benzene leaked into the surrounding air from the products' containers means the total consumer benzene exposure would be even more dangerous than the levels reported.

45.    Valisure filed a Citizen's Petition on Benzoyl Peroxide on March 5, 2024[48] with the FDA requesting the FDA Commissioner to immediately demand a recall of all BPO Products formulated with BPO and further to require that drug manufacturers do independent chemical verification. The Petition is pending.

**F.    DEFENDANT EXPOSED PLAINTIFFS, THE CLASS, AND THE PUBLIC TO BENZENE, A KNOWN HUMAN CARCINOGEN, WITHOUT THEIR KNOWLEDGE**

46.    Although benzene has been found in the BPO Products and released into the surrounding air from the packaging, Defendant did not list benzene among the Products' ingredients, on the Products' label or container, or anywhere in their advertising or on their websites. Defendant did not (and still do not) warn that the Products contain benzene, are at risk of benzene contamination, or that the product could cause consumers to be exposed to benzene even when sealed.

47.    Benzene is a carcinogen that has been among the most studied toxins over the last 100 years due to its wide use during the industrial revolution, extreme danger, and known ability to cause cancer and death in humans and animals. The medical literature linking benzene to blood cancers is

---

[46] *Id.*
[47] *Id.*
[48] As of the date of filing this Class Action, Valisure's FDA Petition is still pending.

vast dating to the 1930s.[49] Benzene is the foundation component for many chemicals used to make plastics, resins, synthetic fibers, paints, dyes, detergents, drugs, and pesticides. In the past, benzene was widely used as a solvent in industrial paints, paint removers, adhesives, degreasing agents, denatured alcohol, and rubber cements. Benzene use has declined due to the proliferation of worker studies and an ever-growing body of evidence confirming benzene's contribution to blood cancers.

48.    Benzene has no known safe level of exposure.[50] Benzene causes central nervous system depression and destroys bone marrow, leading to injury in the hematopoietic system.[51] The International Agency for Research on Cancer ("IARC") classifies benzene as a "Group 1 Carcinogen" that causes cancer in humans, including acute myelogenous leukemia ("AML").[52]  AML is the signature disease for benzene exposure with rates of AML particularly high in studies of workers exposed to benzene.[53]

49.    Benzene exposure is cumulative and additive. There is no safe level of exposure to benzene, and all exposures constitute some risk in a linear, if not supralinear, and additive fashion."[54]

50.    The Agency for Toxic Substances and Disease Registry's ("ATSDR") "Tox Facts" for benzene warns that people can be exposed to benzene vapors from benzene-containing products and that benzene harms the blood marrow, causing leukemia and anemia, and affects the immune system leaving victims vulnerable to infection.[55]

---

[49] *See* Hamilton A., *Benzene (benzol) poisoning,* ARCH PATHOL, (1931):434-54, 601-37; Hunter FT, *Chronic exposure to benzene (benzol). Part 2:  The clinical effects*. J. IND. HYG TOXICOL, (1939):21 (8) 331-54; Mallory TB, et al.,*Chronic exposure to benzene (benzol).Part 3:The pathological results.* J. IND. HYG TOXICOL,(1939):21 (8) 355-93; Erf LA, Rhoads CP., *The hematological effects of benzene (benzol) poisoning.* J. IND. HYG TOXICOL, (1939):21 421-35; American Petroleum Institute, *API Toxicological Review: Benzene,* NEW YORK, (1948); Infante PF, Rinsky RA, Wagoner JK, et al., *Leukemia in benzene workers*,LANCET, (1977);2 (8028): 76-78.
[50] Harrison R, Saborit, J., *WHO Guidelines for Indoor Air Quality – Selected Pollutants, (2010); see also* Smith, Martyn T. (2010). Advances in Understanding Benzene Health Effects and Susceptibility. *Annual Review of Public Health., (*2010) Vol. 31:133-148.
[51] FDA Toxicological Data for Class 1 Solvents, Appendix 4, *Benzene*, https://www.fda.gov/media/71738/download.
[52] International Agency for Research on Cancer. *Benzene, IARC Monographs on the Evaluation of Carcinogenic Risks to Humans, Volume 120,* LYON, France: World Health Organization, (2018).
[53] American Cancer Association, *Benzene and Cancer Risk,*  https://www.cancer.org/cancer/risk-prevention/chemicals/benzene.html (last visited October 20, 2023).
[54] Smith, Martyn T., *Annual Review of Public Health,* ADVANCES IN UNDERSTANDING BENZENE HEALTH EFFECTS AND SUSCEPTIBILITY *(*2010) Vol. 31:133-148.
[55] Agency for Toxic Substances and Disease Registry, *Benzene – Tox Facts*, CAS # 71-43-2.

CLASS ACTION COMPLAINT

51.     According to the FDA, benzene in small amounts over long periods of time can decrease the formation of blood cells and long-term exposure through inhalation, oral intake, and skin absorption may result in cancers such as leukemia and other blood disorders.[56]

52.     Benzene is a major industrial chemical made from coal and oil that is heavily regulated by the EPA as an important environmental pollutant that negatively affects the soil, air, and groundwater. Waste and air emissions containing benzene are considered hazardous waste. The coal, oil, paint, and chemical industries are heavily regulated due to the emission of carcinogens including benzene from refining and other industries processes involving benzene and benzene byproducts, which can end up in the air, water, and food supply.

53.     Benzene is heavily regulated to protect public health and should not be in drug products, especially ones such as acne treatment that are used daily by children and teenagers for many years. The FDA drug guidelines specify that benzene must not be used to make drugs products because of the unacceptable toxicity and deleterious environmental effects.[57]  The FDA allows one limited exception – where the use of benzene in a drug product is unavoidable to produce a drug product with a significant therapeutic advance. In that instance, benzene must be restricted to two parts per million (ppm).[58]  Defendant's BPO Products do not meet this rare exception.

54.     Benzene is heavily regulated in the workplace. The U.S. Occupational Safety and Health Administration ("OSHA") set an eight-hour exposure standard of 1 ppm.[59]  The National Institute for Occupational Safety and Health ("NIOSH") established a recommended exposure level (REL) of 0.1 ppm (15-minute ceiling limit). Subsequent exposure studies known as the "China studies" confirmed cancer at levels below 1 ppm.[60]  The benzene levels created from Defendant's BPO Products are many times higher than the levels reported in these worker studies and the

---

[56] Federal Drug Administration. (June 9, 2022). *Frequently Asked Questions:* https://www.fda.gov/drugs/drug-safety-and-availability/frequently-asked-questions-benzene-contamination-drugs.
[57] Food and Drug Administration, *Q3C – Tables and Lists Guidance for Industry,* https://www.fda.gov/media/71737/download (last visited September 26, 2023).
[58] *Id.*
[59] OSHA. Occupational exposure to benzene:  Final rule. Fed. Reg. 1987;52-34460-578.
[60] *See* Lan Q, Zhang L et al., *Hematotoxicity in Workers Exposed to Low Levels of Benzene,* SCIENCE, (December 3, 2004); Costa-Amaral I, V. B. L., *Environmental Assessment and Evaluation of Oxidative Stress and Genotoxicity Biomarkers Related to Chronic Occupational Exposure to Benzene,* INT J ENVIRON RES PUBLIC HEALTH, (2019) Jun; 16(12): 2240.

acceptable limits set by regulators.

55.    Benzene can also pass from the mother's blood to a developing fetus causing the baby to be exposed to benzene.[61] Animal studies have shown low birth weights, delayed bone formation, and damage to the bone marrow of developing offspring when pregnant animals breathed benzene.[62]

56.    Plaintiffs and the Class were exposed to benzene from the BPO Products by inhalation and dermal absorption. Benzene can be absorbed into the body via inhalation, skin absorption, ingestion, and/or eye contact.[63] Plaintiffs and the Class applied the BPO Products to areas of the skin including the face, neck, chest, and back one to three times per day and used the BPO Products as washes or scrubs in heated showers.  Plaintiffs and the Class were also exposed to benzene leaked from contaminated BPO Products.

### G.    WALGREENS CONCEALED FROM CONSUMERS ITS FAILURE TO TEST THE BPO PRODUCTS FOR SAFETY

57.    Defendant Walgreens' BPO Products degrade to benzene under normal and expected handling, use, or storage but it did not warn the public about the risk of benzene contamination or the health risks of exposure. Instead, Defendant made broad sweeping claims that its BPO Products were safe, and that it was a company concerned about its consumers and the environment leading consumers to believe it would not sell a benzene contaminated Product.[64]

58.    Defendant's affirmations of safety and responsibility, misrepresentations, and omissions of material health and safety information misled Plaintiffs, the Class, the Subclass, and the public regarding the safety, stability, and quality of the BPO Products. Defendant's affirmations of safety and responsibility gave Plaintiffs, the Class, the Subclass, and the public a false sense of safety. Defendant made these statements uniformly to Plaintiffs, the Class, the Subclass, and the public. Defendant's statements were false, misleading, unsubstantiated, and blatantly deceptive.

///

///

---

[61] *Id.*
[62] *Id.*
[63] Centers for Disease Control and Prevention, *The National Institute for Occupational Safety and Health Pocket Guide to Chemical Hazards, Benzene Exposure Limits,*  https://www.cdc.gov/niosh/npg/npgd0049.html.
[64] *Id.*

**H.   WALGREENS DID NOT WARN CONSUMERS THE BPO PRODUCTS WERE AT RISK OF BENZENE CONTAMINATION**

59.    Defendant Walgreens represented to the Plaintiffs, the Class, the Subclass, and the public, that the BPO Products had only the ingredients listed on the Products' label, container, advertising, and packaging.  Defendant never identified benzene anywhere on the Products, or labels, containers, or packaging.  Defendant never disclosed benzene, or that the Product was at risk of degradation to benzene on any of its websites or Product containers.

60.    Defendant's statements about the BPO Products' ingredients were false, deceptive, and misleading. Defendant's statements were meant to convey to Plaintiffs, the Class, the Subclasses, and the public the Products were safe and did not contain carcinogens such as benzene. Defendant made these statements uniformly to consumers and specifically omitted benzene from all advertising, labeling, and packaging when they knew or should have known the statements were false, misleading, and deceptive. Reasonable consumers, relying on Defendant's statements reasonably believed the BPO Products were safe and did not contain benzene.

**I.   WALGREENS MARKETED AND SOLD BPO PRODUCTS AT RISK OF BENZENE CONTAMINATION TO CHILDREN AND TEENAGERS**

61.    Defendant's BPO Products are widely used by children and teenagers as a standalone treatment or in combination with other BPO Products. Defendant knew that adolescents are the largest users with users as young as 7-10 years old. Defendant recommended that consumers, including children, use the BPO Products one to three times a day, over many months or longer for persistent acne. Defendant knew that some consumers would use the BPO Products for many years starting in their teens. There is no cure for acne. Defendant knew that consumers with chronic acne would use their BPO Products several times a day throughout their lifetime.

62.    Defendant aggressively marketed the BPO Products directly to children and teenagers knowing, or they should have known, the BPO Products degrade to benzene under normal use and storage conditions. Many of Defendant's online and print advertisements featured children, teenagers, eye-catching props, music, and colors meant to attract teens and pre-teens, and appeal to their preferences, activities, and interests.

63.    Defendant's marketing of BPO Products without mentioning benzene, the risk of

1  benzene exposure, or testing for benzene wase and continues to be misleading, fraudulent, deceptive,

2  and dangerous.

3    **V.    PUNITIVE DAMAGES ALLEGATIONS**

4    64.    Defendant's conduct was done with malice and reckless disregard for human life.

5  Defendant knew the BPO Products degraded to benzene when exposed to heat under normal

6  consumer use, handling, and storage conditions. Defendant further knew that benzene is a known

7  human carcinogen that is not supposed to be in the BPO Products due to the grave risk of harm to

8  consumers. Defendant disregarded this information and the known risks of benzene exposure and

9  deliberately omitted benzene from the list of ingredients, the BPO Products' labels, and their social

10  media and websites where information about the BPO Products is found. Defendant consciously and

11  deliberately crafted the BPO Products' marketing, labels, packaging, containers, and warnings

12  intending to mislead Plaintiffs, the Class, the Subclasses, and the public, and lead them to believe the

13  BPO Products were safe and carcinogen-free.

14    65.    Defendant is a leading pharmaceutical company that marketed itself as an innovator

15  with integrity, while at the same time withholding material information Defendant knew was essential

16  to informed consumer decision making. Defendant knew that, by their conduct, they were robbing

17  Plaintiffs, the Class, the Subclasses, and the public of their right to choose safe products.

18    66.    Defendant was on notice of benzene findings in consumer products, which lead to

19  widely publicized product recalls. Defendant was on notice of the FDA's concerns of benzene

20  contamination in drug and consumer products and received the FDA's 2022 directive to test Products

21  for benzene contamination.  Defendant disregarded these notices and continued to market and sell the

22  BPO Products to the public without testing them for benzene.

23    67.    Defendant knew its decisions and chosen course of conduct was risky and would cause

24  consumers to be exposed to benzene. Defendant's conduct was not by accident, but was deliberate,

25  calculated, and informed.  Defendant knew they could sell more BPO Products and earn more money

26  by concealing material human health and safety information. Defendant further knew that testing the

27  BPO Products for benzene would yield findings of benzene requiring recalls and/or a shutdown of

28  causing significant losses of income.  Defendant's goals were met not only because of their false and

deceptive advertising, labeling, and packaging, but through a comprehensive scheme of aggressive marketing and image branding leading consumers to believe they were consumer conscious retailers dedicated to safety.  Defendant's conduct and concealment of material health and safety information was done to further their own monetary gain and with conscious disregard of the Plaintiffs, the Class, the Subclasses, and the public's right to choose safe products. Defendant's conduct was intentional, calculated, blatantly deceptive, unscrupulous, and offensive to consumer health and public policy. To redress the harms caused by Defendant's conduct, Plaintiffs, on behalf themselves, the Class, and Subclasses, seek punitive damages against the Defendant.

## VI.    PLAINTIFFS' SPECIFIC ALLEGATIONS

68.    Plaintiff Grace Navarro is a California resident who places a high priority on health and safety, and on the adverse health consequences of exposure to carcinogens such as benzene. In shopping for drug products for her skin and face, Plaintiff Grace Navarro was particularly concerned about the effectiveness to clean out her pores and avoid breakouts on her face. Plaintiff read the front labeling of the product which encouraged her to purchase the product by Defendants. Based on the statements made by Defendants, their widely recognized name, and lack of information that the BPO Products contained carcinogens such as benzene, Plaintiff believed the BPO Products were safe to put on her skin. Defendants' representations and omissions of human health and safety information were material to Plaintiff.

69.    Plaintiff Navarro bought Walgreens' Maximum Strength Acne Foaming Wash and used it from June 2022 to September 2022 for breakouts on her face. Plaintiff was unaware when she bought the BPO Products that it was contaminated with benzene or that it could degrade to benzene. Had Defendants been truthful and told Plaintiff she would be exposed to benzene and/or be at increased risk of cancer, she would not have purchased Walgreens' Maximum Strength Acne Foaming Wash.

70.    Plaintiff Navarro suffered an ascertainable economic loss because of Defendant's statements and misrepresentations in that he bought the BPO Products she would not have bought but for Defendant's statements and misrepresentations.

71.    Plaintiff Chatham Mullins is a Massachusetts resident who places a high priority on

health and safety, and on the adverse health consequences of exposure to carcinogens such as benzene. In shopping for drug products for her skin and face, Plaintiff Chatham Mullins was particularly concerned about the effectiveness to resolve skin inflammation such as redness, cleansing and acne blemishes on her skin and face. Plaintiff read the front labeling of the product which encouraged her to purchase the product by Defendants. Based on the statements made by Defendants, their widely recognized name, and lack of information that the BPO Products contained carcinogens such as benzene, Plaintiff believed the BPO Products were safe to put on her skin. Defendants' representations and omissions of human health and safety information were material to Plaintiff.

72.     Plaintiff Mullins bought Walgreens' Daily Creamy Benzoyl Peroxide Acne Face Wash and used it 2023 for breakouts on her face. Plaintiff was unaware when she bought the BPO Products that it was contaminated with benzene or that it could degrade to benzene. Had Defendants been truthful and told Plaintiff she would be exposed to benzene and/or be at increased risk of cancer, she would not have purchased Walgreens' Daily Creamy Benzoyl Peroxide Acne Face Wash.

73.     Plaintiff Mullins suffered an ascertainable economic loss because of Defendant's statements and misrepresentations in that he bought the BPO Products she would not have bought but for Defendant's statements and misrepresentations.

## VII.   CLASS ACTION ALLEGATIONS

74.     Plaintiffs bring this case on behalf of themselves, and all others similarly situated as a Class Action under Rule 23 of the Federal Rules of Civil Procedure. Plaintiffs seek to represent a National Class of consumers who bought the Products, and State Subclasses of consumers from the states identified below. Excluded from this Class is Defendant, their employees, co-conspirators, officers, directors, legal representatives, heirs, successors, and affiliated companies; Class counsel and their employees; and judicial officers and their immediate families as court staff assigned to the case.

75.     The Class does not seek damages for physical injuries, although Plaintiffs were physically harmed by being exposed to benzene.

76.     The Class will include a National Class to include all persons who bought for use, and not resale, the Products within the United States.

77.     The State Subclasses will include all persons who bought for use, and not resale, the

Products within California, Connecticut, Hawaii, Illinois, Maryland, Massachusetts, Missouri, New York, Nevada, Ohio, Pennsylvania, Rhode Island, and Washington.

78.    This action has been brought and may be properly maintained as a Class Action under Rule 23 of the Federal Rules of Civil Procedure because there is a well-defined community of interest and the proposed Class meets the class action requirements under Rule 23 of numerosity, commonality, typicality, and adequacy of representation.

79.    Defendant engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiffs, on behalf of themselves, and the other Class members. Similar or identical statutory and common law violations, business practices, and injuries are involved.

80.    **Numerosity.** Plaintiffs believe there are millions of Class members throughout the United States, and there are tens of thousands of Subclass members in each of the listed states, making the Class and state Subclasses so numerous and geographically dispersed that joinder of all members is inconvenient and impracticable.

81.    **Commonality.** There are questions of law and fact common to all Class and Subclass members that predominate over questions which affect only individual Class members. All Class and Subclass members were deceived and misled by Defendant through the same advertising, online representations, labeling, and packaging, which do not mention benzene and misrepresent the characteristics, ingredients, and safety of the BPO Products. All Class and Subclass members bought Defendant's BPO Products and have suffered an economic loss because of Defendant's deceptions and omissions. Thus, there is a well-defined community of interest in the questions of law and facts common to all Class and Subclass members. Other common questions of law and fact in this dispute include, without limitation:

a.    Whether Defendant's BPO Products degrade to benzene under common distributor and consumer handling, use, and storage conditions.

b.    Whether Defendant tested the BPO Products for benzene before selling them to Plaintiffs, the Class, and the public.

c.    When Defendant knew or should have known the BPO Products degraded to benzene.

d.    When Defendant knew or should have known the BPO Products contain benzene.

25
CLASS ACTION COMPLAINT

e.  Whether Defendant's advertising omitting benzene was deceptive, fraudulent, or unfair.

f.  Whether Defendant's advertising omitting benzene was likely to deceive reasonable consumers.

g.  Whether Defendant's conduct violated California's Unfair Competition Law, Bus. & Prof. Code § 17200 *et seq.*

h.  Whether Defendant's conduct violated California consumer protection laws.

i.  Whether Defendant's conduct violated Connecticut consumer protection laws.

j.  Whether Defendant's conduct violated Hawaii consumer protection laws.

k.  Whether Defendant's conduct violated Illinois consumer protection laws.

l.  Whether Defendant's conduct violated Massachusetts consumer protection laws including Mass. Gen. Laws Ann. Ch. 93A, § 1 *et seq.*

m.  Whether Defendant's conduct violated Maryland consumer protection laws.

n.  Whether Defendant's conduct violated Missouri consumer protection laws including Mo. Rev. Stat. § 407, *et seq.*

o.  Whether Defendant's conduct violated Nevada consumer protection laws including Deceptive Trade Practice Act, NEV. REV. STATUTES, Title 52, Chapter 598 *et seq*.

p.  Whether Defendant's conduct violated New York consumer protection laws including New York Deceptive Trade Practices Law, NY Gen. Bus. §349(a) and NY Gen. Bus. §§ 350 *et seq.*

q.  Whether Defendant's conduct violated Pennsylvania consumer protection laws.

r.  Whether Defendant's conduct violated Rhode Island consumer protection laws.

s.  Whether Defendant's conduct violated Washington's consumer protection laws.

t.  Whether Defendant breached the express and implied warranties they made about the BPO Products.

u.  Whether Defendant was unjustly enriched by the Plaintiffs, the proposed Class, and Subclasses members' purchase of the BPO Products.

v.  Whether the Plaintiffs, the proposed Class, and Subclasses have been injured and if so, what is the proper measure of damages.

w.  Whether the Plaintiffs, the proposed Class, and Subclasses have the right to economic damages including compensatory, exemplary, and statutory remedies for Defendant's misconduct.

x.  Whether the Plaintiffs, the proposed Class, and Subclasses have the right to injunctive, declaratory, or other equitable relief and attorneys' fees.

82.  **Typicality.** Plaintiffs' claims are typical of the claims of the Class and Subclasses because the claims arise from the same course of misconduct by Defendant, *i.e.,* Defendant's false and misleading advertising and their failure to disclosure benzene in the Products. The Plaintiffs, and all Class and Subclass members were all exposed to the same uniform and consistent advertising, labeling, and packaging statements Defendant made about the Products. Because of the Defendant's misconduct, Plaintiffs, like all Class members, were damaged and have incurred economic loss because of buying the Products believed to be safe. The claims of the Plaintiffs are typical of Class members.

83.  **Adequacy.**  The Plaintiffs will fairly and adequately represent and protect the interests of all Class and Subclass members. Plaintiffs have no interests antagonistic to the Class or Subclass members. Plaintiffs hired attorneys experienced in the prosecution of consumer Class Actions and Plaintiffs intend to prosecute this action vigorously. Plaintiffs anticipate no difficulty in the management of this litigation as a Class Action.

84.  Finally, this Class Action is proper under Rule 23(b) because, under these facts, a Class Action is superior to other methods and is the most efficient method for the fair and efficient adjudication of the dispute. The Class and Subclass members have all suffered economic damages because of Defendant's deceptive trade practices, false advertising, and omissions of material health and safety information. Because of the nature of the individual Class and Subclass members' claims and the cost of the Products, few, if any individuals, would seek legal redress against Defendant because the costs of litigation would far exceed any potential economic recovery. Absent a Class Action, individuals will continue to suffer economic losses for which they would have no remedy, and Defendant will unjustly continue their misconduct with no accountability while retaining the profits of their ill-gotten gains. Even if separate cases could be brought by individuals, the resulting multiplicity

27
CLASS ACTION COMPLAINT

1   of lawsuits would cause undue hardship, burden, and expense for the Court and the litigants, as well

2   as create a risk of inconsistent rulings across the country, which might be dispositive of the interests

3   of individuals who are not parties. A Class Action furthers the important public interest of containing

4   legal expenses, efficiently resolving many claims with common facts in a single forum

5   simultaneously, and without unnecessary duplication of effort and drain on critical judicial resources.

6   The Class Action method presents far fewer management difficulties than individual cases filed

7   nationwide and provides the benefit of comprehensive supervision by a single court.

8                          **VIII.  CAUSES OF ACTION**

9       **A.      VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW BUS. & PROF.**
        **CODE § 17200 *et seq.*, *on Behalf of the California Subclass***
10

11       85.     Plaintiffs reallege and incorporates all other paragraphs in this Class Action Complaint

12   and further allege:

13       86.     Plaintiffs bring this cause of action on behalf of themselves, and all members of the

14   California Subclass, all of whom are similarly situated consumers.

15       87.     California's Unfair Competition Law, CAL. BUS. & PROF. CODE § 17200, *et seq.,*

16   prohibits "unlawful, unfair, or fraudulent business act or practices" and "unfair, deceptive, untrue or

17   misleading advertising."  Defendant regularly transacts business in California, including in this

18   District, and has engaged in misconduct that has had a direct, substantial, foreseeable, and intended

19   effect of injuring people in California, and in this District.

20       88.     Defendant misrepresented their Products in advertising, labels, and containers and

21   misled Plaintiffs, the Subclass, and the public about the ingredients, characteristics, purity, quality,

22   approval, and safety of the Products. Defendant led Plaintiffs, the Subclass, and the public to believe

23   the Products were safe.

24       89.     Defendant's advertising, online representations, labeling, and packaging of the Products

25   were misleading, fraudulent, and deceptive. Defendant knew through the Products' development,

26   formulation, research, and pre-sale safety and stability testing, the Products were not chemically and

27   physically stable when exposed to common temperature conditions. Defendant knew or should have

28   known the Products formulated benzene under normal and expected consumer use, handling, and

storage conditions, and that consumers would be exposed to benzene. Defendant were specifically reminded by the FDA of their obligation to ensure the safety and quality of their Products, including testing them for benzene before selling them to the public, but shirked their duties and continued to market and sell the Products without substantiating their safety, or warning Plaintiffs, the Class, and the public about benzene.

90.     Defendant omitted material health and safety information, *e.g.,* benzene, from the Products' advertising, label, container, and warnings. Defendant did not tell Plaintiffs and the Class members they would be exposed to benzene, a human carcinogen, during normal and expected handling, use and storage of the Products, even with the Products' container closed.

91.     Defendant's acts and omissions were likely to deceive reasonable consumers and the public. Reasonable consumers expect to be told about all ingredients in Products. Reasonable consumers further expect that carcinogens in the Products be disclosed. Reasonable consumers further expect that on market drugs to be free of carcinogens, unless told otherwise. Benzene in a widely marketed drug product used by children, teens, and the public is material health information reasonable consumers expect to be told.

92.     Had Defendant been truthful in their advertising, labeling, packaging, and online statements about benzene in the Products, or the risk of contamination, and the risk of cancer, Plaintiffs and the Class members would not have bought the Products.

93.     Defendant's acts, omissions, and concealment of material health and safety information are ongoing and continuing to cause harm. Defendant continued to market, advertise, and sell the Products to the public without telling the public about benzene in the Products, or the risk of contamination, and the risk of cancer. Defendant continued to market themselves as responsible drug manufacturers and sellers who sell safe products when they have not tested the Products for benzene or quantified the levels of benzene formed in the Products during normal and expected storage conditions.

94.     Defendant engaged in these deceptive practices for significant financial gain, which is unfair, unreasonably dangerous to Plaintiffs and the California Subclass members, and not outweighed by any benefit. Omitting and concealing material human health and safety information such as

benzene in the Product and the consumers' risk of cancer from the Products is unethical, unscrupulous, and offensive.

95.     Plaintiffs suffered ascertainable economic losses because of Defendant's misconduct because he bought the Products, he otherwise would not have bought but for Defendant's misrepresentations and affirmations of safety.

96.     Because of Defendant's misconduct, Plaintiffs, on behalf of themselves, and the California Subclass, seek recovery of their economic damages, attorneys' fees, restitution, and all other relief allowable under CAL. BUS. & PROF. CODE § 17200, *et seq.,* including an injunction to enjoin Defendant from continuing their fraudulent and deceptive business practices. The damages sought are ascertainable, uniform to the Class and can be measured and returned to the Class members.

**B.    <u>VIOLATION OF CALIFORNIA'S CONSUMER LEGAL REMEDIES ACT,<br>CAL. CIV. CODE § 1750, *et seq.,* on Behalf of the California Subclass</u>**

97.     Plaintiffs reallege and incorporates all other paragraphs in this Complaint and further allege:

98.     Plaintiffs bring this cause of action on behalf of themselves, and the California Subclass members, all of whom are similarly situated consumers within the meaning of CAL. CIV. CODE § 1781.

99.     Defendant's acts and omissions violated California's Consumer Legal Remedies Act, CAL. CIV. CODE § 1750, *et seq.,* enacted to protect consumers from being victimized and deceived by advertisers, distributors, and sellers like the Defendant. Defendant regularly transacts business in California, including in this District, and has engaged in misconduct that has had a direct, substantial, foreseeable, and intended effect of injuring people in California, and in this District.

100.    California's Consumer Legal Remedies Act, CAL. CIV. CODE § 1750, *et seq. prohibits* unfair methods of competition and unfair or deceptive acts or practices in connection with the sale of consumer goods. Defendant violated several prohibitions of CIV. CODE § 1750(a).

101.    Defendant violated CAL. CIV. CODE § 1750(a)(2) by representing the source, sponsorship, and approval, of the Products, *e.g.,* the Products were backed by sound scientific

principles, that Defendant met its obligations to conduct adequate and meaningful quality and safety testing before selling the Products to the public, and represented the Products only contained the ingredients listed, and were free of carcinogens.

102.    Defendant violated CAL. CIV. CODE § 1750(a)(3) by representing the affiliation, connection, or association with, or certification by, another *e.g.,* the Products were approved by dermatologists and manufactured in conformity with current good manufacturing practices.

103.    Defendant violated CAL. CIV. CODE § 1750 (a)(4) by using deceptive representations, *e.g.,* the Products were safe, validated, and supported by the latest research, and free of carcinogens such as benzene.

104.    Defendant violated CAL. CIV. CODE § 1750(a)(5) by representing the Products have characteristics, ingredients, uses, or benefits, which they do not, *e.g.,* misleading Plaintiffs and the Class members the Products only contained the listed ingredients, did not contain benzene, and did not increase the risk of the consumers' risk of cancer.

105.    Defendant violated CAL. CIV. CODE § 1750(a)(6) by representing the Products were not deteriorated unreasonably or altered *e.g.,* the Products were pure and had not degraded or formed benzene.

106.    Defendant violated CAL. CIV. CODE § 1750(a)(7) by representing the Products were pure and of a particular standard or quality, when they are not.

107.    Defendant violated CAL. CIV. CODE § 1750(a)(9) by advertising the Products with the intent not to sell them as advertised*, e.g.,* the Products were of pure quality, safe, made in conformity with current good manufacturing practices, and not adulterated.

108.    Had Defendant been truthful in their advertising, labeling, packaging, warnings, and online statements about benzene in the Products and the risk of cancer, Plaintiffs and the California Subclass members would not have bought the Products. Benzene, a human carcinogen, in a widely marketed and available consumer drug product, is material health and safety information Defendant knew Plaintiffs, the Class members, and the public would want to know. The Defendant's omission of this material information was common to Plaintiffs and all Subclass members and made to Plaintiffs and all Subclass members uniformly through common advertising, online representations, labeling,

and packaging.

109.   Defendant's acts, omissions, and concealment of material health and safety information are ongoing and continuing to cause harm. Defendant continued to market, advertise, and sell the Products to the public without telling the public about benzene in the Products and the risk of cancer. Defendant continues to market themselves as responsible drug manufacturers and sellers who sell safe products when they have not quantified the levels of benzene in and created in the Products during normal and expected storage conditions.

110.   Defendant engaged in these deceptive practices for significant financial gain, which is unfair, unreasonably dangerous to Plaintiffs and the Subclass members, and not outweighed by any benefit. Omitting and concealing material human health and safety information such as the consumers' risk of cancer from exposure to the Products is unethical, unscrupulous, and offensive.

111.   Plaintiffs suffered ascertainable economic losses because of Defendant's misconduct because he bought the Products, she otherwise would not have but for Defendant's misrepresentations.

112.   Because of Defendant's misconduct, Plaintiffs, on behalf of themselves and the California Class seek recovery of their economic damages, attorneys' fees, punitive damages, restitution, and all other relief allowable under CAL. CIV. CODE § 1750, *et seq.,* including an injunction to enjoin Defendant from continuing their fraudulent business practices. The damages sought are ascertainable, uniform to the Subclass and can be measured and returned to the Subclass members.

C.   **FALSE ADVERTISING UNDER VARIOUS STATE STATUTES,** *Individually and on behalf of the California, Hawaii and New York Subclasses*

113.   Plaintiffs reallege and incorporates all other paragraphs in this Complaint and further allege:

114.   Plaintiffs bring this cause of action on behalf of themselves, and all members of the California, Hawaii, and New York Subclasses, all of whom are similarly situated consumers.

115.   Defendant develops, tests, selects, markets and/or sells the BPO Products throughout the United States in its stores and through eCommerce websites. Defendant knew through the Products' development, formulation, and selection, the Products were not chemically stable when exposed to certain expected and normal environmental and storage conditions and formed benzene, as

1    a toxic byproduct. Despite this knowledge, Defendant did not mention benzene in the Products'

2    advertising, ingredient lists, labels, containers, or warnings. Defendant did not tell Plaintiffs, and the

3    Subclass members they would be exposed to benzene, a human carcinogen, during normal and

4    expected handling, use and storage of the Products, even with the Products' containers closed.

5           116.    Benzene, a human carcinogen, in a widely marketed and available consumer drug

6    product, is material health and safety information Defendant knew Plaintiffs, and the Subclass

7    members would want to know. Defendant not only omitted this material human health and safety

8    information from advertising, online representations, blogs, labeling, packaging, and warnings, but

9    aggressively marketed itself as consumer conscious, a market leader, and company committed to

10   consumer safety. Defendant's brand notoriety, market share, and affirmations of safety misled

11   Plaintiffs, and the Subclass members, leading them to believe the Products were tested, verified, and

12   safe.  Defendant further marketed the Products touting the approval of dermatologists, who were not

13   aware of the presence of benzene in the Products and of Defendant's refusal to conduct adequate and

14   meaningful testing before marketing and selling the Products to the public and following the FDA's

15   2022 alert to specifically look for benzene.

16          117.    Defendant's acts and omissions constitute false advertising. Defendant advertised the

17   Products with the intent not to sell them as advertised. Reasonable consumers, including Plaintiffs and

18   the Subclass members, exposed to Defendant advertising would believe the Products were safe,

19   verified, and free of benzene.

20          118.    Defendant's false and misleading advertising violated California's False Advertising

21   Law, Bus. & Prof. Code § 17500 *et seq.,* which prohibits Defendant from disseminating statements

22   "which are untrue or misleading, and which are known, or which by the exercise of reasonable care

23   should be known, to be untrue or misleading."  Defendant knew or should have known the Products

24   formed benzene under normal, handling, use, and storage conditions but did not disclose this to

25   Plaintiffs and the Class and Subclass members. Defendant knew or should have known the Products

26   were not chemically stable when exposed to certain normal and expected environmental conditions.

27          119.    Defendant's false and misleading advertising violated Hawaii's False Advertising Law,

28   HI REV. STAT. § 708-871. Defendant knowingly or recklessly made false and misleading statements in

the Products' advertising to the public.[65]  Defendant further advertised the Products with the intent not to sell them as advertised and misrepresented the ingredients, quality, purity, safety, and character of the Products.

120.    Defendant's false and misleading advertising violated New York's General Business Law § 350 *et seq*. ("GBL § 350"), which prohibits "[f]alse advertising in the misconduct of any business, trade or commerce or in the furnishing of any service" in New York. Under GBL § 350, "false advertising" includes "advertising, including labeling, of a commodity . . . if such advertising is misleading in a material respect." Defendant violated GBL § 350 by advertising and selling the Products without disclosing material health and safety information, *e.g.,* benzene and the consumers risk of cancer from benzene. Defendant's false and misleading advertising was directed at consumers, the New York Subclass members, and the public, and caused consumer injury and harm to the public interest.

121.    Had Defendant been truthful in their advertising, online representations, labeling, and packaging about benzene, Plaintiffs, and the Subclass members would not have bought the Products.

122.    Plaintiffs, on behalf of themselves, and the California, Hawaii, and New York Subclass members suffered ascertainable economic losses because of Defendant's misconduct because they bought the Products, they otherwise would not have but for Defendant's material misrepresentations.

123.    Because of Defendant's misconduct, Plaintiffs, on behalf of themselves, and the California, Hawaii, and New York Subclass members, seek recovery of their economic damages, attorneys' fees, punitive damages, restitution, and all other relief allowable by law, including an injunction to enjoin Defendant from continuing their fraudulent business practices. The damages sought are ascertainable, uniform, and can be measured and returned.

///

_____

[65] HI REV STAT § 708-871, False Advertising: (1) A person commits the offense of false advertising if, in connection with the promotion of the sale of property or services, the person knowingly or recklessly makes or causes to be made a false or misleading statement in any advertisement addressed to the public or to a substantial number of persons. (2) "Misleading statement" includes an offer to sell property or services if the offeror does not intend to sell or provide the advertised property or services: (a) At the price equal to or lower than the price offered; or (b) In a quantity sufficient to meet the reasonably- expected public demand unless quantity is specifically stated in the advertisement; or (c) At all.

**D.    <u>DECEPTIVE TRADE PRACTICES UNDER VARIOUS STATE STATUTES,</u>** *Individually and on Behalf of the California, Connecticut, Hawaii, Illinois, Maryland, Massachusetts, Missouri, New York, Nevada, Pennsylvania, Ohio, Rhode Island, and Washington Subclasses*

124.    Plaintiffs reallege and incorporates all other paragraphs in this Complaint and further allege:

125.    Plaintiffs bring this cause of action on behalf of themselves, and all members of the Connecticut, Hawaii, Illinois, Maryland, Massachusetts, Missouri, New York, Nevada, Pennsylvania, Ohio, Rhode Island, and Washington Subclasses, all of whom are similarly situated consumers.

126.    Defendant's acts and omissions constitute deceptive business practices in violation of state deceptive trade practices laws.

127.    Defendant represented the BPO Products had characteristics, uses, and benefits, they did not, *e.g.,* Defendant represented the BPO Products were pure, of good quality, safe, and only contained the ingredients disclosed.

128.    Defendant represented the BPO Products were not deteriorated or altered, when they knew, or should have known, the BPO Products degraded to benzene under normal and expected use, handling, and storage conditions.

129.    Defendant represented the BPO Products contained only the ingredients listed on Defendant's websites, advertising, labels, and containers. Defendant did not disclose to Plaintiffs, the Class and Subclass members, and the public the BPO Products were at risk of benzene contamination.

130.    Defendant advertised the BPO Products with the intent not to sell them as advertised.

131.    Defendant's acts and omissions violated California's Consumer Legal Remedies Act, CAL. CIV. CODE § 1750, et seq., enacted to protect consumers from being victimized and deceived by advertisers, distributors, and sellers like the Defendant.

132.    Defendant's acts and omissions violated Connecticut Unfair Trade Practices Act, CONN. GEN STAT. ANN., § 42- 110, *et seq.,* which broadly prohibits Defendant from engaging in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce such as those committed by Defendant and alleged in this Class Action.

133.    Defendant's acts and omissions violated Hawaii's Uniform Deceptive Trade Practice

Act, HAW. REV. STAT. §481-A3 because Defendant: (1) caused the likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of the Products; (2) represented the Products had characteristics, ingredients, or benefits, they did not; (3) represented the Products were not deteriorated or altered, when they were;  (4) represented the Products were of a particular standard or quality when they were not; and (5) advertised the Products with the intent not to sell them as advertised.

134.    Defendant's acts and omissions violated Illinois' Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 *et seq*. Defendant's used deception, fraud, false pretense, false promises, and omitted material health and safety information about the Products' degradation to benzene, and/or contamination with benzene, which Defendant intended the Illinois Subclass members to rely upon.

135.    Defendant's acts and omissions violated Maryland's Unfair or Deceptive Trade Practices Act, MD. COM. CODE, Title 13, Subtitle 3, §13-301 because Defendant: (1) represented the Products had characteristics, ingredients, uses, and benefits, they did not; (2) represented the Products were not deteriorated or altered, when they were; (3) represented the Products were of a particular standard or quality, when they were not.  Defendant's representations about the Products' ingredients, and omission of benzene were misleading, deceptive, incomplete, and not truthful in violation of Maryland's Unfair or Deceptive Trade Practices Act.

136.    Defendant's acts and omissions violated Massachusetts consumer protection law, MASS. GEN. LAWS ANN. Ch. 93A, § 1 *et seq.*, which broadly prohibits unfair and deceptive trade practices such as those committed by Defendant and alleged in this Class Action.

137.    Defendant's acts and omissions violated the Missouri Merchandising Practices Act, MO. REV. STAT. § 407, *et seq.*, which prohibits the use of deception, fraud, misrepresentations, or unfair practices by a business, *e.g.,* marketing Products as safe, approved, tested, and only containing the listed ingredients. Missouri's law further prohibits the suppression or omission of material facts such as the Products' degradation to benzene.

138.    Defendant's acts and omissions violated N.Y. GEN. BUS. LAW § 349, which prohibits Defendant from engaging in deceptive, unfair, and misleading acts and practices such as those

committed by Defendant and alleged in this Class Action. Defendant's misrepresentations and omissions caused consumer injury and harm to the public interests of protecting public health and the public's right to know about any harmful constituents in the Products.

139.    Defendant's acts and omissions violate Nevada Deceptive Trade Practice Act, NEV. REV. STATUTES, Title 52, Chapter 598 *et seq*. which prohibits Defendant from making false statements about their Products and advertising the Products without the intent to sell them as advertised.

140.    Defendants' acts and omissions violated Ohio's Consumer Sales Practices Act, OHIO REV. CODE ANN. § 1345.01, *et seq.* which prohibits sales practices that are deceptive, unfair, or unconscionable, and Ohio's Deceptive Trade Practices Act, OHIO REV. CODE ANN.§ 4165 *et seq.*

141.    Defendant's acts and omissions violated Pennsylvania's Unfair Trade Practices and Consumer Protection Law, 73 P.S. §§201-1 *et seq.* because Defendant: (1) caused the likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of the Products; (2) used deceptive representations about the Products; (3) represented the Products had characteristics, ingredients, or benefits, they did not; (3) represented the Products were not deteriorated or altered, when they were;  (4) represented the Products were particular standard or quality when they are not; and (5) advertised the Products with the intent not to sell them as advertised.

142.    Defendant's acts and omissions violated Rhode Island's Deceptive Trade Practices Act, R.I. GEN. LAWS § 6- 13.1- 5.2(B), *et seq.* because Defendant: (1) caused likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of the Products; (2) used deceptive representations in connection with the Products; (3) represented the Products had sponsorship, approval, characteristics, ingredients, uses, benefits, they did not; (4) represented the Products were not deteriorated or altered, when they were; (5) represented the Products were of a particular standard, quality, or grade, when they were not; and (6) advertised the Products with the intent not to sell them as advertised.

143.    Defendant's acts and omissions violated Washington's Consumer Protection Act, WASH. REV. CODE § 19.86.010, *et seq.,* which broadly prohibits Defendant from engaging in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade

or commerce.[66]  Defendant's concealment of material health and safety information about the Products, which they knew or should have known, was injurious to the public interests of protecting public health and the public's right to know about any harmful constituents in the Products. Defendant's conduct caused harm to the Plaintiffs, the Washington subclass members, and members of the public who bought the Products without knowing they degraded to benzene. Defendant's conduct has the capacity to cause harm to other persons who buy the Products.

144.    Had Defendant been truthful in their advertising, labeling, and packaging of the Products and not omitted material health and safety information about benzene in and formed from the Products, Plaintiffs, the Class, and Subclass members would not have bought the Products.

145.    Defendant's acts and omissions and violations of the state consumer protection statutes are ongoing and continuing to cause harm.

146.    Plaintiffs, on behalf of themselves, and the Subclasses suffered an ascertainable economic loss because of Defendant's misconduct because they bought the Products, they would not have bought but for Defendant's misrepresentations.

147.    Because of Defendant's misconduct, Plaintiffs, on behalf of themselves, and the Subclasses seek recovery of their economic damages, attorneys' fees, punitive damages, and all other relief allowable under the law. The damages sought are ascertainable, uniform and can be measured and returned.

E.    **BREACH OF EXPRESS WARRANTY,** *Individually and on Behalf of the Nationwide Class and on Behalf of the California, Connecticut, Hawaii, Illinois, Maryland, Massachusetts, Missouri, New York, Nevada, Pennsylvania, Ohio, Rhode Island, and Washington State Subclasses*

148.    Plaintiffs reallege and incorporates all other paragraphs in this Complaint and further allege:

149.    Plaintiffs bring this cause of action on behalf of themselves, and all members of the National Class and the California, Connecticut, Hawaii, Illinois, Maryland, Massachusetts, Missouri, New York, Nevada, Pennsylvania, Ohio, Rhode Island, and Washington Subclasses, all of whom are

---

[66] Under § 19.86.090, Washington consumers harmed by such practices may recover actual damages, the costs of the suit, including reasonable attorney's fees, and the court may, in its discretion, increase the award of damages to an amount up to three times the actual damages sustained.

1  similarly situated consumers.

2      150.    The Uniform Commercial Code § 2-313 provides that an affirmation of fact or promise

3  made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain

4  creates an express warranty that the goods shall conform to the promise. Defendant advertised and

5  sold the Products as safe, pure, of good quality, and only containing the listed ingredients.

6  Defendant's advertising, labels, containers, packaging, advertising, and online statements did not

7  mention benzene, leading consumers to believe the Products were safe for their ordinary use.

8  Defendant's affirmations were uniformly made to Plaintiffs, the Class, and Subclass members by

9  Defendant in the Products' advertising, labeling, packaging, and online statements and were part of

10  the basis of the bargain between Defendant, the Plaintiffs, the Class, and Subclass members.

11      151.    Defendant's affirmations and promises are unlawful. When Defendant marketed,

12  distributed, and sold the Products, Defendant knew, or should have known, the Products degraded to

13  benzene under normal and expected use, handling, and storage conditions. Defendant knew, or should

14  have known, the Products formed benzene and therefore did not conform to Defendant's express

15  representations and warranties to consumers. Plaintiffs, the Class, and Subclass members purchased

16  the Products in reasonable reliance on Defendant's statements.

17      152.    Because of Defendant's misconduct, Plaintiffs, on behalf of themselves, the Class and

18  Subclass members seek recovery of their economic damages, attorneys' fees, punitive damages,

19  restitution, and all other relief allowable by law, including an injunction to enjoin Defendant from

20  continuing their fraudulent business practices. The damages sought are ascertainable, uniform to the

21  Class and Subclasses and can be measured and returned to the Class and Subclass members.

22  **F.    <u>BREACH OF IMPLIED EXPRESS WARRANTY</u>, *Individually and on Behalf of*
23      *the Nationwide Class and on Behalf of the California,* **Hawaii**, *Illinois, Maryland,*
        *Massachusetts, Missouri, New York, Nevada, Pennsylvania, Ohio, Rhode Island, and*
24      *Washington Subclasses***

25      153.    Plaintiffs reallege and incorporates all other paragraphs in this Complaint and further

26  allege:

27      154.    Plaintiffs bring this cause of action on behalf of themselves, and all members of the

28  National Class and the California, Connecticut, Hawaii, Illinois, Maryland, Massachusetts, Missouri,

New York, Nevada, Pennsylvania, Ohio, Rhode Island, and Washington Subclasses, all of whom are similarly situated consumers.

155.    Defendant, as sellers of the Products, also made implied warranties including warranting the Products were of the same quality and purity represented on the labels, in advertising, and on Defendant's websites, were fit for the ordinary purpose of the Products and conformed to the promises made on the containers, labels, advertising, and websites that all ingredients were listed, and all warnings given.

156.    Defendant advertised their Products as safe, when they knew, or should have known, the Products degraded to benzene. Defendant did not list benzene as an ingredient or contaminant anywhere on the Products or advertising. The Products are not of the quality and purity represented by Defendant because the Products degrade to benzene under normal use, handling, and storage conditions.

157.    Defendant did not tell Plaintiffs or the Class or Subclass members the Products were not fit for their ordinary use because the Products, as advertised and sold by Defendant, degraded to benzene under normal and expected handling, use, and storage.

158.    Defendant's affirmations that the Products were safe for use were uniformly made to the Plaintiffs and the Class members in the Products' advertising, labeling, and packaging, and on Defendant's websites, which were part of the basis of the bargain.

159.    Plaintiffs, the Class, and Subclass members purchased the Products in reasonable reliance on Defendant's statements, affirmations, and omissions of material health and safety information.

160.    Defendant's acts and omissions are ongoing and continuing to cause harm.

161.    Because of Defendant's misconduct, Plaintiffs, on behalf of themselves, the Class and Subclass members, seek recovery of their actual damages, injunctive relief, attorneys' fees, punitive damages, and all other relief allowable under the law. The damages sought are uniform to the Class and Subclasses and the actual damages can be measured and returned to consumers who bought Defendant's Products.

///

**G.      <u>UNJUST ENRICHMENT</u>,** *Individually and on Behalf of the Nationwide Class and on Behalf of the California, Hawaii, Illinois, Maryland, Massachusetts, Missouri, New York, Nevada, Pennsylvania, Ohio, Rhode Island, and Washington Subclasses*

162.    Plaintiffs reallege and incorporates all other paragraphs in this Complaint and further allege:

163.    Plaintiffs brings this cause of action on behalf of themselves, and all members of the National Class and the California, Connecticut, Hawaii, Illinois, Maryland, Massachusetts, Missouri, New York, Nevada, Pennsylvania, Ohio, Rhode Island, and Washington Subclasses, all of whom are similarly situated consumers.

164.    Defendant has unjustly profited from their deceptive business practices and kept the profits from Plaintiffs and the Class and Subclass members who purchased the Products.

165.    Defendant requested and received a measurable economic benefit at the expense of Plaintiffs, the Class, and Subclass members as payment for the Products. Defendant accepted the economic benefits from Plaintiffs, the Class, and Subclass members knowing the economic benefit received was based on deception and omission of material human health and safety information.

166.    There is no utility in Defendant's misconduct and Defendant's enrichment from the misconduct is unjust, inequitable, unconscionable, and against the strong public policy to protect consumers against fraud.

167.    Because of Defendant's misconduct, Plaintiffs, on behalf of themselves, the Class and Subclass members, and the public seeks recovery of their actual damages, disgorgement of profits, injunctive relief, attorneys' fees, punitive damages, and all other relief allowable under the law. The damages sought are uniform to the Class and Subclasses and the actual damages can be measured and returned to consumers who bought Defendant's Products.

## IX.    PRAYER FOR RELIEF

168.    WHEREFORE, Plaintiffs pray for judgment against Defendant:

169.    That the Court determine this action may be maintained as a Class Action under Rule 23(a) and (b)(1), (2) and (3) of the Federal Rules of Civil Procedure;

   a.    That Defendant's misconduct be adjudged to have violated the state consumer protection laws identified herein;

b. That injunctive and declaratory relief be awarded against Defendant, including but not limited to an order prohibiting Defendant from engaging in the alleged misconduct;

c. That Defendant be ordered to disgorge profits and revenues derived from their course of misconduct and that such unjust enrichment be restored to the class and or distributed cy pres as the Court shall deem just and equitable;

d. That Plaintiffs recover all compensatory damages and other damages sustained by Plaintiffs;

e. That Plaintiffs recover punitive damages as allowed by law;

f. That Plaintiffs recover all statutory damages as allowed by law;

g. That Plaintiffs recover their attorneys' fees and all costs of suit;

h. That Plaintiffs recover all Statutory pre-judgment and post-judgment interest on any amounts; and

i. That all further relief as this Court may deem just and proper be granted.

## X. <u>DEMAND FOR JURY TRIAL</u>

166. Demand is made for a jury trial.

Dated: March 8, 2024                    **WISNER BAUM LLP**

By: <u>*/s/ R. Brent Wisner*</u>
R. Brent Wisner, Esq. (SBN: 276023)
rbwisner@wisnerbaum.com
11111 Santa Monica Blvd, #1750
Los Angeles, CA 90025
Telephone: (310) 207-3233
Facsimile: (310) 820-7444

*Attorney for Plaintiff*s