# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GRACE NAVARRO, *on behalf of themselves, and all others similarly situated, and the general public*, et al.,<br>Plaintiffs,<br>v.<br>WALGREENS BOOTS ALLIANCE, INC.,<br>Defendant. | Case No. 1:24-cv-00290-JLT-SAB<br>FINDINGS AND RECOMMENDATIONS RECOMMENDING GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS<br>(ECF No. 54)<br>**OBJECTIONS DUE WITHIN FOURTEEN DAYS** |

Pending before the Court is Defendant Walgreens Boots Alliance, Inc.'s ("Walgreens") motion to dismiss. On April 29, 2026, the Court held a hearing on the matter. R. Brent Wisner, Esq., appeared for Plaintiffs. Rick Shackelford, Esq., appears for Walgreens. Having considered the moving papers and arguments by counsel, as well as the Court's file, the Court issues the following findings and recommendations recommending granting in part and denying in part Walgreens' motion to dismiss.

## I.

## REGULATORY BACKGROUND

This is a consumer fraud putative class action regarding alleged economic harms caused by the sale of Walgreens' benzol peroxide ("BPO") acne treatment drug products. (ECF No. 46-2, ¶ 1.) According to Plaintiffs Grace Navarro, Chatham Mullins, Alexzander Hudson, and Pamela Giurrizzo ("Plaintiffs"), Walgreens sold BPO products that "contain and/or degrade into

dangerously high levels of benzene—a known human carcinogen, impurity, and illegal adulterant." (Id.) Acne treatments are drug products that are regulated by the U.S. Food and Drug Administration ("FDA"), pursuant to the Food, Drug, and Cosmetics Act ("FDCA"). (Id. at ¶ 4.) Additionally, over-the-counter ("OTC") drugs are regulated by the FDA and must be safe and effective. (Id. at ¶¶ 5, 8, 95.) OTC drugs are subject to federal current Good Manufacturing Practices ("cGMP") regulations. (Id. at ¶¶ 4, 5; see id. at ¶ 101.) The cGMP regulations require OTC drug products meet safety, quality, purity, identity, and strength standards. 21 U.S.C. § 351(a)(2)(B). (Id.) The cGMPs establish

> minimum current good manufacturing practice for methods to be used in, and the facilities or controls to be used for, the manufacture, processing, packing, or holding of a drug to assure that such drug meets the requirements of the act as to safety, and has the identity and strength and meets the quality and purity characteristics that it purports or is represented to possess.

21 C.F.R. § 210.1(a); (see ECF No. 46-2, ¶¶ 110, 111.) In other words, these regulations cover design, manufacture, and distribution of OTC drug products. Id. Moreover, cGMP regulations set minimum standards for organization and personnel; buildings and facilities; equipment; control of components and drug product containers and closures; production and process controls; packaging and label controls; holding and distribution; laboratory controls; records and reports; and returned and salvaged drug products. See id.; see generally 21 C.F.R. §§ 211, 351(a)(2)(B).

An OTC drug monograph establishes conditions, such as active ingredients, uses (indications), doses, routes of administration, labeling, and testing, under which an OTC drug in a given therapeutic category (*e.g.*, sunscreen, antacid, acne product) is generally recognized as safe and effective for its intended use. See Topical Acne Drug Products for Over-the-Counter Human Use; Final Monograph, 56 FR 41008-01, 1991 WL 156981 (F.R. Aug. 16, 1991). "Any product which fails to conform to an applicable monograph after its effective date is liable to regulatory action." 21 C.F.R. § 330.10(b); (see ECF No. 46-2, ¶ 95, 99.) In other words, once a final monograph goes into effect, it is illegal to sell a drug that no longer conforms to "each of the conditions contained in this part [330.1] and in an applicable monograph[.]" 21 C.F.R. §

330.1. The "conditions contained in this part" include a requirement that "(a) [t]he product is manufactured in compliance with current good manufacturing practices, as established by parts 210 and 211 of this chapter." 21 C.F.R. § 330.1(a). In turn, parts 210 and 211 describe the cGMPs described above.

**II.**

**BENZENE, BENZOL PEROXIDE, AND BPO PRODUCT BACKGROUND**

Benzene is used primarily as a solvent in the chemical and pharmaceutical industries, as a starting material and intermediate in the synthesis of numerous chemicals, and in gasoline. The major United States source of benzene is petroleum. (ECF No. 46-2, ¶ 39.) Benzene is also a known human carcinogen, classified as a Group 1 carcinogen by the International Agency for Research on Cancer. (Id. at ¶¶ 43, 44.) The health hazards of benzene have been recognized for over one hundred years, and the scientific and regulatory communities agree that it is a known human carcinogen with severe consequences to human exposure. (Id. at ¶ 40.) According to the National Cancer Institute, "[e]xposure to benzene increases the risk of developing leukemia and other blood disorders." (Id. at ¶ 45.) Furthermore, the CDC warns that "[b]enzene works by causing cells not to work correctly. For example, it can cause bone marrow not to produce enough red blood cells, which can lead to anemia. Also, it can damage the immune system by changing blood levels of antibodies and causing the loss of white blood cells." (Id. at ¶ 48.) Benzene has no known safe level of exposure and exposure is cumulative and additive. (Id. at ¶¶ 3, 42, 47.)

Fifty million Americans suffer from acne annually, with acne beginning as early as age seven and persisting through adulthood into ages 50s and 60s. (Id. at ¶ 29.) BPO is a drug used to treat acne, and to make the finished BPO Products, BPO, a dry white powder, is mixed with other ingredients to create topical drug creams, cleansers, scrubs, and washes for use on the face and body. (Id. at ¶¶ 2, 33.) BPO is formulated into these products at concentrations up to 10%. (Id. at ¶ 33.)

Plaintiffs allege that the BPO in products made and sold by Walgreens degrades over time to directly form benzene. (Id. at ¶ 2, 6.) Essentially, Plaintiffs assert that BPO can

thermally decompose into benzene radicals that can then produce benzene. (See id. at ¶¶ 81, 84.) Plaintiffs allege that this process was first reported in scientific literature as early as 1936. (Id. at ¶ 82.)

Valisure LLC ("Valisure") is an analytical laboratory and online pharmacy that tests medications and healthcare products to ensure their safety, quality, and consistency. (Id. at ¶ 66.) Valisure is accredited by the International Organization for Standardization ("ISO/IEC") 17025:2017 standards for chemical testing (PJLA Accreditation Number 94238) and is registered with the Drug Enforcement Administration (License # RV0484814). (Id. at ¶ 67.) On March 5, 2024, Valisure filed a citizen petition ("Valisure Petition") with FDA, requesting a recall and suspension of sales of BPO from the U.S. market. (Id. at ¶ 63, 65; ECF No. 46-2, ¶ 66.)[1] In layman's terms, Valisure reported that it had tested and detected high levels of benzene in specific batches of BPO products, including the Walgreens Maximum Strength 10% BPO Acne Foaming Wash and the Walgreens Daily Creamy BPO Acne Face Wash. (See Valisure Petition, pp. 15-16; see ECF No. 46-2, ¶ 69.) More specifically, Valisure stated that "current evidence suggests that on-market BPO products could produce substantial amounts of benzene when stored at above-ambient temperatures, specifically 37°C (98.6°F), 50°C (122°F) and 70°C (158°F)." (Valisure Petition, p. 1.) Moreover, Valisure also detected the substantial production of benzene "emanating externally into the air surrounding an unopened benzol peroxide product," which implicates possible inhalation exposure. (Id. at p. 3.) Valisure observed that the problem with benzene in BPO products is seemingly due to the "inherent instability of the benzol peroxide molecule that breaks down and forms benzene." (Id. at p. 8) (emphasis omitted); (see ECF No. 46-2, ¶¶ 7, 62, 123.)

[1] Plaintiffs have unambiguously incorporated Valisure's citizen petition into the first amended complaint. (ECF No. 46-2, ¶ 66 n.41.) "Even if a document is not attached to a complaint, it may be incorporated by reference into a complaint if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim." United States v. Ritchie, 342 F.3d 903, 908 (9th Cir. 2003). "If the documents are not physically attached to the complaint, they may be considered if the documents' authenticity is not contested and the plaintiff's complaint necessarily relies on them." Lee v. City of Los Angeles, 250 F.3d 668, 688 (9th Cir. 2001) (cleaned up). Because the citizen petition is a filing with a government agency, and because Plaintiff's claims necessarily rely on the findings detailed therein, the Court incorporates the citizen petition into the first amended complaint. In light of this, the Court will, where appropriate, cite to the citizen petition for precision of language and cite it hereinafter as "Valisure Petition."

The Valisure Petition acknowledged the most recent guidance from the FDA, which in 2011 determined that "that benzoyl peroxide [2.5% to 10%] can be adequately labeled to minimize risks while delivering effective acne treatment." (Id. at p. 3.) Meanwhile prescription-strength BPO products require a warning that: "[t]he role of benzoyl peroxide as a tumor promoter has been well established in several animal species. However, the significance of this finding in humans is unknown." (Id.)

Valisure tested 66 different BPO products, both prescription and OTC, including at least two products from Walgreens, incubating the products at 122 degrees Fahrenheit for 18 days. (Id. at pp. 15-18; see ECF No. 46-2, ¶¶ 70.) Results demonstrated that there was a "substantial instability of BPO and its propensity to form concerningly high levels of benzene in only 18 days." (Valisure Petition, p. 18.) Valisure noted that 122 degrees Fahrenheit is a reasonable temperature to test because it is a temperature the products may be exposed to during distribution and because it is an "accepted incubation temperature" used in the pharmaceutical industry. (Id. at pp. 17-18.)[2] In addition, Valisure stated that it observed evidence that BPO product packaging may be porous to benzene, enabling some of the benzene "to escape into the environment or air around the package." (Id. at p. 22; see ECF No. 46-2, ¶ 68, 76.)

Valisure offered a possible future remedy to address BPO instability, suggesting the creation of reformulations of BPO-containing acne treatment products. (Id. at p. 25.) Nonetheless, the Petition seeks, among other relief, "to have the Commissioner and FDA request recalls and a suspension of sales for products containing the active pharmaceutical ingredient benzoyl peroxide, consistent with FDA's mandate to ensure the safety of prescription and over the counter the drugs in the United States." (Id. at p. 29; see also ECF No. 46-2, ¶ 79.)

Pursuant to FDA guidance, benzene should be restricted to 2 ppm (parts per million) where its use in manufacturing is unavoidable in order to produce a drug product with a significant therapeutic advance. (See ECF No. 46-2, ¶¶ 9, 16, 51, 53, 54.) As a Class 1 solvent, benzene should not be employed in the manufacture of drug substances or drug products except

---

[2] Similar findings were made when Valisure tested certain products, incubating them at 158 degrees Fahrenheit. (Valisure Petition, pp. 19-21; see also ECF No. 46-2, ¶ 70.)

in only if unavoidable. (Id. at ¶ 53.) In December 2022, the FDA issued a statement alerting manufacturers to the risk of benzene contamination and

> remind[ing] drug manufacturers they are required to establish scientifically sound and appropriate specifications and test procedures to assure drug components (active and inactive ingredients) and finished drug product conform to appropriate specifications (21 CFR 211.84, 21 CFR 211.160). This includes testing of raw materials and finished product batches (21 CFR 211.165) prior to release to ensure they meet appropriate specifications for identity, strength, quality and purity.

(Id. at¶ 94.). The statement also included that "[i]f any drug product batches with benzene above 2 ppm are already in distribution, the manufacturer should contact FDA to discuss the voluntary initiation of a recall[.]" (Id.) The FDA further warned that if any drug or drug component was subject to deterioration, drug manufactures must have re-testing procedures in place to ensure continued purity and stability. (Id. at ¶ 95.) The FDA put out a substantially similar update in December 2023. (Id. at ¶¶ 59, 95 n.65.)

Beginning in 2020, the FDA started working with companies to identify benzene in products which has resulted in product recalls of hand sanitizers, sunscreens, and deodorants. (Id. at ¶ 93.) In the last three years, the FDA has announced over a dozen recalls of various drug and cosmetic products containing low levels or even trace levels of benzene, including hand sanitizers, aerosol sunscreens, and aerosol antiperspirants. (Id. at ¶ 60.)

## III.

## FACTUAL AND PROCEDURAL BACKGROUND

Plaintiffs in this action are Grace Navarro, Chatham Mullins, Pamela Giarrizzo, and Alexander Hudson. (ECF No. 46-2, ¶¶ 14-17.) Plaintiffs are citizens of California, Massachusetts, and Connecticut. (Id.) Essentially, each Plaintiff purchased one or more of Walgreens' BPO products, and

> When purchasing the BPO Products, Plaintiff[s] reviewed the accompanying labels and disclosures and understood them as representations and warranties by Defendant that the product was properly manufactured, free from defects, and safe for its intended use. Plaintiff[s] relied on these representations and warranties in deciding to purchase the BPO Product and these representations and warranties were part of the basis of the bargain in that [they] would not have purchased, or would have paid less for, the BPO

> Product, if [they] had known of the omissions that the BPO Product was not, in fact, properly manufactured, free from defects, or safe for their intended use. Accordingly, Plaintiff[s] [were] injured in fact and lost money as a result of Defendant's improper conduct.

(Id. at ¶ 14; see id. at ¶¶ 15-17.)

As to Plaintiff Giarrizzo, "[f]ollowing the public disclosures regarding BPO instability, Plaintiff Giarrizzo had her personal, unused portion of Walgreens Tinted Acne Treatment Cream (Exp. 12/26) independently tested by a qualified analytical laboratory." (Id. at ¶ 16.) "On March 31, 2025, the analysis revealed that the product contained a staggering 176.48 ppm of benzene—more than 88 times the FDA's 2 ppm 'safe harbor' limit for unavoidable contamination." (Id.)

As to Plaintiff Hudson, he "bought BPO Products including Walgreens' Maximum Strength Acne Foaming Wash and Walgreens Maximum Strength Acne Gel for his pores and breakouts from his local Walgreens, and also in New York, California, and Florida while traveling, and used it from May 2011 to September 2024." (Id. at ¶ 17.)

Defendant is Walgreens, a company that is a citizen of Illinois and Delaware with its principal place of business in Deerfield, Illinois. (Id. at ¶ 21.) Plaintiffs state that Walgreens dominates the drug and consumer health care products markets as a pharmacy and retail leader serving millions of customers and patients every day. (Id. at ¶ 30.) Walgreens has approximately 13,000 locations worldwide, and it earned 139.1 billion dollars during fiscal year 2023. (Id.) Walgreens manufactures, labels, stores, transports, and sells a large selection of products, including well known BPO Products, such as Maximum Strength Walgreens Tinted Acne Treatment Cream, Maximum Strength Acne Gel, Acne Spot Treatment Lotion, Daily Creamy Benzoyl Peroxide Acne Face Wash, Maximum Strength Acne Foaming Wash. Walgreens's generic BPO Products are sold under its own name. (Id. at ¶ 32.) Walgreens' BPO products are used by children and teenagers as a standalone treatment or in combination with other BPO products. (Id. at ¶ 35.)

Plaintiffs allege that Walgreens makes promises to consumers, such as affirming the BPO Products are a daily treatment that helps treat acne and prevent future breakouts. (Id. at ¶ 97.) Walgreens provides a 100% satisfaction guarantee on all of their BPO products. (Id.) According

to Plaintiffs, Walgreens' BPO Products are adulterated under 21 U.S.C. § 351 because they contain a decomposed substance in the form of benzene, which forms during normal handling, storage, and use, and because Walgreens failed to manufacture, test, and control the Products in conformity with current good manufacturing practices, exposing consumers to an unsafe drug. (Id. at ¶¶ 109-15.) As such, benzene's presence in BPO products violates multiple provisions of 21 U.S.C. § 351: it is a decomposed or filthy substance under §351(a)(1), and its presence results from inadequate methods, facilities, or controls in violation of current good manufacturing practice under §351(a)(2)(B), rendering the product adulterated. (Id.)

Plaintiffs allege that Walgreens engaged in deceptive, untrue, and misleading conduct by advertising the BPO products as safe and legal over-the-counter drugs while failing to warn consumers of the presence and risk of benzene contamination. (Id. at ¶¶ 139-40.) Reasonable consumers, relying on Walgreens' statements, reasonably believed the BPO products were safe and free of carcinogens like benzene. (Id. at ¶ 137) "[Walgreens] made these statements uniformly to consumers and specifically omitted any reference to benzene from all advertising, labeling, and packaging, despite knowing or having reason to know—given the well-established instability of BPO and degradation pathway—that such statements were misleading and posed serious danger to consumers' health." (Id. at¶ 148) Thus, Plaintiffs allege Walgreens knowingly, recklessly, or at least negligently introduced misbranded BPO products into the market, and Plaintiffs would not have purchased the products had they been truthfully and accurately labeled. (Id.)

On March 8, 2024, Plaintiffs commenced this action, and following motion practice, on January 5, 2026, Plaintiffs filed the operative complaint. (ECF No. 46-2.) Therein, Plaintiffs bring the following claims against Walgreens:

> 1) violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, et seq.;
>
> 2) violation of California's Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750, et seq.;
>
> 3) violation of California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code §§ 17500, et seq., as well as similar statutes under the laws of Hawaii and New York;

> 4) violation of deceptive trade practices under the laws of California, Connecticut, Hawaii, Illinois, Maryland, Massachusetts, Missouri, New York, Nevada, Pennsylvania, Ohio, Rhone Island, and Washington State;
>
> 5) breach of express warranty under the laws of California, Connecticut, Hawaii, Illinois, Maryland, Massachusetts, Missouri, New York, Nevada, Pennsylvania, Ohio, Rhone Island, and Washington State;
>
> 6) breach of implied warranty under the laws of California, Connecticut, Hawaii, Illinois, Maryland, Massachusetts, Missouri, New York, Nevada, Pennsylvania, Ohio, Rhone Island, and Washington State; and
>
> 7) unjust enrichment under the laws of California, Connecticut, Hawaii, Illinois, Maryland, Massachusetts, Missouri, New York, Nevada, Pennsylvania, Ohio, Rhone Island, and Washington State;

(ECF No. 46-2, ¶¶ 170-263.) For relief, Plaintiffs pray for an order certifying a proposed class; an order declaring Walgreens' conduct violates the laws outline in the causes of action; injunctive and declaratory relief; a court order for Walgreens to disgorge profits and revenues derived from the course of misconduct; compensatory and other damages; punitive damages allowable by law; attorney's fees and costs of suit; statutory pre-judgment and post-judgment interest. (Id. at ¶ 265.)

On February 19, 2026, Walgreens moved to dismiss the first amended complaint for lack of standing and failure to state a claim, and the district judge referred the motion to the undersigned for the preparation of findings and recommendations. (ECF Nos. 54, 55.) The motion has been fully briefed (ECF Nos. 57, 58), and on April 29, 2026, the Court held a hearing on the matter. (ECF No. 61.)

**IV.**

**LEGAL STANDARDS**

Under Federal Rule of Civil Procedure 12(b)(1), a complaint must be dismissed if a plaintiff lacks Article III standing to bring suit. Maya v. Centex Corp., 658 F.3d 1060, 1067 (9th Cir. 2011). The standing doctrine is derived from limitation of Article III on the judicial power of federal courts to hear only "actual cases or controversies." Spokeo, Inc. v. Robins, 578 U.S. 330, 337 (2016) (internal quotation marks omitted). "The doctrine limits the category of litigants

empowered to maintain a lawsuit in federal court to seek redress for a legal wrong." Id. at 338. Standing "is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek." TransUnion LLC v. Ramirez, 594 U.S. 413, 431 (2021). "The irreducible constitutional minimum of standing consists of three elements. The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." Spokeo, 578 U.S. at 338 (cleaned up), quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992). A plaintiff must show that the injury was "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." Lujan, 504 U.S. at 560 (internal quotation marks omitted).

The party invoking federal jurisdiction bears the burden of demonstrating standing. TransUnion, 594 U.S. at 430-31. A jurisdictional challenge under Rule 12(b)(1) may be facial or factual. Safe Air for Everyone v. Meyer, 373 F.3d 1035, 1039 (9th Cir. 2004). A facial challenge "asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction." Id. The "'general rule' for Rule 12(b)(1) motions challenging subject-matter jurisdiction is to take allegations 'as true unless denied or controverted by the movant.'" Federal Bureau of Investigation v. Fikre, 601 U.S. 234, 237 n.1 (2024), quoting 5C C. Wright & A. Miller, Federal Practice and Procedure § 1363, p. 107 (3d ed. 2004). A factual challenge "disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction." Safe Air for Everyone, 373 F.3d at 1039. Generally, in resolving a factual attack, "the district court may review evidence beyond the complaint without converting the motion to dismiss into a motion for summary judgment" and "need not presume the truthfulness of the plaintiff's allegations." Id. (citations omitted). However, the Ninth Circuit recently clarified that "when jurisdictional issues are 'intertwined with an element of the merits of the plaintiff's claim,' the court must treat the motion like a motion for summary judgment and 'leave the resolution of material factual disputes to the trier of fact.'" Bowen v. Energizer Holdings, Inc., 118 F.4th 1134, 1143 (9th Cir. 2024), quoting Leite v. Crane Co., 749 F.3d 1117, 1122 (9th Cir. 2014).

Additionally, Federal Rule of Civil Procedure 8(a)(2) requires a complaint to include "a short and plain statement of the claim showing that the pleader is entitled to relief." A complaint that fails to meet this standard may be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6). To overcome a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009), quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. "Plausibility requires pleading facts, as opposed to conclusory allegations or the formulaic recitation of the elements of a cause of action, and must rise above the mere conceivability or possibility of unlawful conduct that entitles the pleader to relief." Somers v. Apple, Inc., 729 F.3d 953, 959-60 (9th Cir. 2013) (cleaned up). "Factual allegations must be enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at 555.

In ruling on a Rule 12(b)(6) motion, the court "accept[s] all factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party." Rowe v. Educ. Credit Mgmt. Corp., 559 F.3d 1028, 1029-30 (9th Cir. 2009) (citation omitted). But "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences" need not be accepted. In re Gilead Scis. Sec. Litig., 536 F.3d 1049, 1055 (9th Cir. 2008) (citation omitted). "Dismissal is appropriate when the complaint lacks a cognizable legal theory or sufficient factual allegations to support a cognizable legal theory." Saloojas, Inc. v. Aetna Health of Cal., Inc., 80 F.4th 1011, 1014 (9th Cir. 2023) (cleaned up).

Plaintiffs' claims sound in fraud and thus must be alleged with particularity under Rule 9(b). See Kearns v. Ford Motor Co., 567 F.3d 1120, 1125 (9th Cir. 2009). To meet this standard, a plaintiff's complaint must "identify the who, what, when, where, and how of the misconduct charged, as well as what is false or misleading about the purportedly fraudulent statement, and why it is false." Salameh v. Tarsadia Hotel, 726 F.3d 1124, 1133 (9th Cir. 2013).

/ / /

/ / /

## V.

## DISCUSSION AND ANALYSIS

Walgreens begins by arguing that the operative complaint fails to meet the Rule 9(b) pleading standard, including that Plaintiffs have not alleged plausible theories of universal benzene contamination or benzene contamination as a result of cGMP violations. (ECF No. 54, pp. 8-13.) Second, Walgreens takes on Plaintiffs expanded misbranding theory, arguing the labeling at issue included broad claims and puffery. (Id. at 14-19.) Third, Walgreens again argues that all of Plaintiffs claims are expressly or impliedly preempted, or alternatively, the primary jurisdiction doctrine applies. (Id. at pp. 19-21.) Thereafter, Walgreens argues that Plaintiffs lack standing to assert claims on behalf of products they did not purchase, as well as Plaintiffs lack standing for injunctive relief. (Id. at pp. 21, 23-24.) Finally, Walgreens argues that Plaintiffs equitable relief claims must be dismissed because they allege adequate legal remedies. (Id. at pp. 21-22.)

Plaintiffs oppose, beginning with that their adulteration and misbranding theories are not preempted. (ECF No. 57, pp. 1-14.) Thereafter, Plaintiffs address Walgreens' primary jurisdiction argument. (Id. at p. 22-23.) Plaintiffs then insist that standing regarding products Plaintiffs actually purchased is better suited for class certification. (Id. at pp. 23-24.) Plaintiffs next argue that they have standing to pursue injunctive relief and that they have pleaded their equitable relief in the alternative. (Id. at pp. 23-25.)

The Court takes the parties' arguments in the order the Court finds most logical.

### A. Judicial Notice

Through the briefing on this motion, the parties have both sought judicial notice of various documents. Walgreens has moved for judicial notice of (1) the Valisure Petition and (2) The United States Pharmacopœial Convention, General Chapter ⟨467⟩ Residual Solvents (2008). (ECF Nos. 51, 59.) Plaintiffs have moved for judicial notice of (1) The United States Pharmacopœial Convention, General Chapter ⟨467⟩ Residual Solvents (2025); (2) the briefing on the appeal in Montegenro v. CVS Pharmacy, Inc., Nos. Nos. 24-6404, 24-6431 & 24-6684 (9th Cir.); and (3) the briefing on the appeal in O'Dea v. Alchemee LLC, Nos. 25-3240 & 25-3271 (9th Cir.). (ECF Nos.

57-1–57-7.)

"As a general rule, 'a district court may not consider any material beyond the pleadings in ruling on a Rule 12(b)(6) motion.'" Lee v. City of Los Angeles, 250 F.3d 668, 688 (9th Cir. 2001), quoting Branch v. Tunnell, 14 F.3d 449, 453 (9th Cir. 1994). Doing so would convert a motion to dismiss into a motion for summary judgment. Fed. R. Civ. P. 12(d). However, a court may take judicial notice of a fact not subject to reasonable dispute, either because the fact is generally known within the territorial jurisdiction of the trial court or because the fact is capable of accurate and ready determination from sources whose accuracy cannot reasonably be questioned. Fed. R. Evid. 201(b). Courts may also take judicial notice of undisputed matters of public record, Lee, 250 F.3d at 689, including documents filed in federal or state courts. Harris v. Cnty. of Orange, 682 F.3d 1126, 1132 (9th Cir. 2012). As relevant here, "[a]s a general matter, websites and their contents may be proper subjects for judicial notice." Jones v. Tonal Systems, Inc., 751 F. Supp. 3d 1025, 1031 (S.D. Cal. 2024). This is especially true where "allegations in the complaint necessarily rely [on the documents], even if not expressly referenced in the complained, provided that the authenticity of those documents are not in dispute." Id.

Furthermore, "[e]ven if a document is not attached to a complaint, it may be incorporated by reference into a complaint if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim." United States v. Ritchie, 342 F.3d 903, 908 (9th Cir. 2003). "If the documents are not physically attached to the complaint, they may be considered if the documents' authenticity is not contested and the plaintiff's complaint necessarily relies on them." Lee, 250 F.3d at 688 (cleaned up).

The Court finds judicial notice is appropriate. Specifically, the documents are the Valisure Petition, a chapter from the USP, and filings in the Ninth Circuit, which are generally appropriate for judicial review. No party has objected to the other's requests for judicial notice. Thus, the Court GRANTS the requests for judicial notice. (Nos. 51, 59, 57-1–57-7.)

**B. Preemption**

From the outset, Plaintiffs clarify that they bring three adulteration theories of how benzene allegedly gets into Walgreens's BPO products. (ECF No. 57, pp. 2-13.) First, Plaintiff outline that

they believe Walgreens's products are adulterated with benzene, pursuant to 21 U.S.C. § 351(a). Second, Plaintiffs argue that Walgreens' BPO products are adulterated under 21 U.S.C. § 351(b) by exceeding a 2-ppm limit. Third, Plaintiffs assert that Walgreens's BPO products were adulterated pursuant to 21 U.S.C. § 351(a)(2)(b) as a result of cGMP violations. Last, Plaintiffs clarify with refined argument how their misbranding claims are not preempted, addressing the issues raised in the Court's previous findings and recommendations. (Id. at pp. 14); see Navarro v. Walgreens Boots Alliance, Inc., No. 24-cv-00290-JLT-SAB, 2025 WL 1411406, at *11-*12 (E.D. Cal. 2025).

Walgreens contend that Plaintiffs' arguments here really break down into two arguments regarding preemption on an adulteration theory (generally) and preemption on Plaintiffs' misbranding claims. (ECF No. 54, pp 8-19.) Walgreens then goes a step further and argues that, again notwithstanding the Court's previous ruling, Plaintiffs' cGMP claims are preempted. (Id. at pp. 19-21.)

This time, the Court agrees with Plaintiffs in all aspects.

**1. Preemption Legal Principles.**

"A fundamental principle of the Constitution is that Congress has the power to preempt state law." Crosby v. Nat'l Foreign Trade Council, 530 U.S. 363, 372 (2000). Preemption comes in multiple forms—express, field, and conflict preemption—but the purpose of Congress is "the ultimate touchstone" for all of them. Gilstrap v. United Air Lines, Inc., 709 F.3d 995, 1003 (9th Cir. 2013), quoting Cipollone v. Liggett Grp., Inc., 505 U.S. 504, 516 (1992).

As relevant here, to ensure uniformity in the regulation of OTC drugs like Walgreens's BPO products, the FDCA contains a broad express preemption provision, which provides that no state "may establish or continue in effect any requirement—(1) that relates to the regulation of a [nonprescription drug]; and (2) that is different from or in addition to, or that is otherwise not identical with, a requirement under" the FDCA. 21 U.S.C. § 379r(a). The statute defines "requirement" to include "any requirement relating to public information or any other form of public communication relating to a warning of any kind for a drug." 21 U.S.C. § 379r(c)(2).

OTC acne drug products, including Walgreens's products, are governed by a

comprehensive set of FDA regulations called a monograph, which includes certain labeling requirements. 21 C.F.R. §§ 330.1, 330.5, 330.10; 333.350. The Acne Monograph expressly permits BPO to be an active ingredient in these products in an amount from 2.5 to 10 percent. 21 C.F.R. § 333.310(a). Section 333.350 provides detailed instructions for labeling covered products, including specific warnings and directions that must be included for products containing BPO. 21 C.F.R. § 333.350(c)(4), (d)(2). The regulations provide that an OTC acne drug product "is generally recognized as safe and effective and is not misbranded if it meets each of the conditions" in the monograph and "each general condition" in 21 C.F.R. § 330.1. Id. at § 333.301. In turn, Section 330.1 specifies that OTC drugs must meet the conditions described therein and must be "labeled in compliance with chapter V" of the FDCA and "the format and content requirements in § 201.66." 21 C.F.R. § 330.1(c)(1). Chapter V of the FDCA prohibits the sale of adulterated or misbranded drugs. 21 U.S.C. §§ 331(a), 351, 352.

Consistent with Congress's intent to promote uniform drug regulation, "state law claims regarding the labeling or packaging of [OTC drugs] that are not identical to the [FDCA] are expressly preempted." Henning v. Luxury Brand Partners, LLC, No. 22-cv-07011-TLT, 2023 WL3555998, at *5 (N.D. Cal., May 11, 2023); see Gisvold v. Merck & Co., 62 F. Supp. 3d 1198, 1203 (S.D. Cal. 2014). However, Section 379r does not preempt claims under state law that impose identical or "parallel" requirements to FDA regulations. Riegel v. Medtronic, 552 U.S. 312, 330 (2008); see Ebrahimi v. Mentor Worldwide LLC, 804 Fed. Appx. 871, 872 (9th Cir. 2020) (mem.). As recognized by the Ninth Circuit, the Supreme Court of the United States in "Buckman . . . left the door open to state-law claims 'parallel' to federal requirements." McClellan v. I-Flow Corp., 776 F.3d 1035, 1040 (9th Cir. 2015); see Davidson v. Sprout Foods, Inc., 106 F.4th 842, 849 (9th Cir. 2024), discussing Buckman Co. v. Plaintiffs' Legal Committee, 531 U.S. 341 (2021). To avoid preemption, "[t]he plaintiff must be suing for conduct that *violates* the FDCA (or else his claim is expressly preempted [ ]) but the plaintiff must not be suing *because* the conduct violates the FDCA (such a claim would be impliedly preempted under Buckman)." Perez v. Nidek Co., Ltd., 711 F.3d 1109, 1120 (9th Cir. 2013) (citation omitted) (emphasis in original).

The upshot of the regulations and the Acne Monograph, described above, is that a drug that

complies with *all* monograph requirements is not misbranded. 21 C.F.R. § 330.10(a)(1) ("The Commissioner shall . . . evaluate the safety and effectiveness of OTC drugs, to review OTC drug labeling, and to advise him on the promulgation of monographs establishing conditions under which OTC drugs are generally recognized as safe and effective and not misbranded"). The Acne Monograph lists BPO as a permitted active ingredient. U.S. Food & Drug Admin., Over-the-Counter (OTC) Monograph M006: Topical Acne Drug Products for Over-the-Counter Human Use; see also 21 C.F.R. § 333.310(a); 21 C.F.R. § 333.350(c)(4). Some courts have observed that the FDA's Monograph "allows [topical acne drugs] to be formulated with the active ingredient [BPO] and does not require disclosure that [BPO] may degrade into [benzene]." Williams v. Galderma Laboratories, L.P., No. 24 CV 2222, 2024 WL 4213220, at *3 (N.D. Ill. Sept. 17, 2024), quoting Truss v. Bayer Healthcare Pharms. Inc., No. 21 CV 9845 (VB), 2022 WL 16951538, at *4 (S.D.N.Y. Nov. 15, 2022); see Mut. Pharm. Co. v. Bartlett, 570 U.S. 472, 488-90 (2013). That said, as mentioned above, the monograph itself requires that the product follow "each general condition" in 21 C.F.R. § 330.1.

**2. Preemption and Misbranding Theory**

The Court begins with the parties arguments regarding misbranding. Essentially, this issue boils down to two sides. Walgreens believes that by complying with the Acne Monograph, it has no other duty under the FDCA and requiring that it do anything more in terms of branding would be preempted under 21 U.S.C. § 379r. Plaintiffs assert that the Acne Monograph itself requires Walgreens to comply with other general labeling requirements of the FDCA. Upon consideration of the parties' refined arguments and authority, the Court is persuaded that in addition to the Acne Monograph's other requirements, Walgreens is subject to Chapter V of the FDCA, which covers general labeling requirements. In order to arrive at this conclusion, the Court takes a tour into the interlocking statutory framework.

To begin, the Court quotes, in relevant part, the Acne Monograph:

> An over-the-counter acne drug product in a form suitable for topical application is generally recognized as safe and effective and is not misbranded if it meets each of the conditions in this subpart **and** each general condition established in § 330.1 of this chapter.

21 C.F.R. § 333.301(a) (emphasis added).

In turn, § 330.1 provides

> An over-the-counter (OTC) drug listed in this subchapter is generally recognized as safe and effective and is not misbranded if it meets each of the conditions contained in this part and each of the conditions contained in any applicable monograph. Any product which fails to conform to each of the conditions contained in this part and in an applicable monograph is liable to regulatory action.
>
> * * *
>
> The product is labeled in compliance with chapter V of the Federal Food, Drug, and Cosmetic Act (the act) and subchapter C et seq. of this chapter, including the format and content requirements in § 201.66 of this chapter. An OTC drug product that is not in compliance with chapter V and subchapter C, including § 201.66 of this chapter, is subject to regulatory action.

21 C.F.R. § 330.1(c)(1).

And under Chapter V, "[a] drug or device shall be deemed to be misbranded . . . [i]f its labeling is false or misleading in any particular" or "[i]f it is dangerous to health when used in the dosage or manner, or with the frequency or duration prescribed, recommended, or suggested in the labeling thereof." 21 U.S.C. §§ 352(a)(1), (j).

With the foregoing laid out, the Court finds it plausible that compliance with the Acne Monograph includes meeting "each general condition established in § 330.1 of this chapter." 21 C.F.R. § 333.301(a). Moreover, § 330.1(c)(1) expressly incorporates Chapter V of the FDCA, which covers general misbranding. Thus, with this understanding, it does not appear that a misbranding theory, based on Chapter V of the FDCA, is expressly preempted by the Acne Monograph. See Rutledge v. Walgreen Co., ___ F.4th ___, 2026 WL 2015284, at *5 (2d Cir. July 13, 2026) (discussing that in context of Internal Analgesic, Antipyretic, and Antirheumatic Drug Products monograph that incorporates § 330.1, "The IAAA monograph sets forth various labeling requirements. . . . The monograph does not, however, expressly prohibit additional warnings not specified therein.").

Walgreens' only real response to this is citing to the preemption statute itself, which states in relevant part:

> . . . no State or political subdivision of a State may establish or continue in effect any requirement— . . . that is different from or in addition to, or that is otherwise not identical with, a requirement under this chapter [*i.e.*, the FDCA]."

21 U.S.C. § 379r(a)(2).

This appears to get Walgreens nowhere because the Acne Monograph itself requires compliance with each general condition established in § 330.1, which in turn incorporates Chapter V labeling requirements.

Indeed, two recent district courts to examine this issue have sided with Plaintiffs' position here. In In re Target Corporation BPO Sales and Marketing Litigation, the district court noted that various district courts had held that a misbranding theory of liability was preempted by § 379r but that "most courts to have addressed this issue stop[ped] with the monograph." No. 24-cv-1323 (ECT/JFD), 2026 WL 145824, at *10 (D. Minn. Jan. 20, 2026). In reviewing the cases cited by the parties, including this Court's previous findings and recommendations, the In re Target court observed that in the caselaw

> none addresses the regulations' additional requirement that, to be 'not misbranded,' an OTC product's labeling must also comply with 21 C.F.R. § 330.1, including Chapter V's more general proscription against 'false or misleading' labeling, 21 U.S.C. § 352(a)(1). And no reason or explanation has been identified to show why the monograph might trump § 352(a)(1)'s more general requirement.

Id.

The Court agrees with In re Target that a theory of misbranding, pursuant to state-law, *may* sufficiently parallel the FDCA's requirements under Chapter V. Plaintiffs allege that benzene is present in Walgreens BPO products and that benzene causes adverse health consequences. Accepting those allegations as true, the Acne Monograph/FDCA plausibly would have required Walgreens to disclose the presence of benzene on the BPO products' labeling. Walgreens' attempt to distinguish In re Target is not persuasive. (ECF No. 58, p. 7.)

Next, in Mitchell v. Kenvue, Inc., the district court noted the divide between other courts and the approach taken in In re Target. No. 24-cv-4109 (GC) (JBD), 2026 WL 509400, at*13 (D.N.J. Feb. 24, 2026). As the Court analyzed above, the Mitchell court observed that "the Acne

Monograph itself also recognizes that its labeling requirements are subject to Chapter V of the FDCA." Id., citing 21 C.F.R. §§ 333.301(a), 333.350(b). Moreover, the Mitchell court also noted that "[a]lthough Plaintiffs' Chapter V misbranding theory is not preempted, Plaintiffs must still allege that their claims are cognizable under parallel state law," which the Court finds to be true here as well. Id. at *14.

Following taking the matter under submission, Walgreens alerted the Court to the recent Supreme Court decision Monsanto Co. v. Durnell, 609 U.S. ___, 146 S. Ct. 2001 (2026).[3] The Court has reviewed the case and finds that it is not apposite to the case at bar. Critically, Durnell did not involve the interplay between a monograph and preemption statute. Rather, in Durnell—a case involving pesticides under the Federal Insecticide, Fungicide, and Rodenticide Act—the issue before the Court involved only a preemption statute. Id. at *2. As relevant here, the preemption statute in that case provided the following:

> **(a) In general**
>
> A State may regulate the sale or use of any federally registered pesticide or device in the State, but only if and to the extent the regulation does not permit any sale or use prohibited by this subchapter.
>
> **(b) Uniformity**
>
> Such State shall not impose or continue in effect any requirements for labeling or packaging in addition to or different from those required under this subchapter.

7 U.S.C. § 136v(a), (b).

Similar here, the plaintiff in Durnell brought a failure to warn claim arguing that the defendant's product could be carcinogenic. 146 S. Ct. at 2006. Essentially, the Court observed that the plaintiff's state tort claim would require the defendant to add a cancer warning to its product's label even though federal law required the defendant to use the EPA-approved label without a cancer warning. Id. Because the plaintiff's state tort claim would impose a pesticide

[3] Under the Court's Local Rules, a notice of supplemental authority is warranted without prior Court approval and "may contain a citation to the new authority but may not contain additional argument on the motion." L.R. 230(m)(2). Accordingly, the Court has considered the parties notices where appropriate herein. (See ECF No. 62, 64, 65, 66.) The Court observes that the Local Rules do not contemplate oppositions or responses to a notice of supplemental authority, which the Court observes should not have been filed without leave of the Court. (ECF Nos. 63, 67.)

labeling requirement "in addition to or different from" the label required by EPA, the Supreme Court held that this claim was expressly preempted. Id.

As should be apparent, subsection (b) of § 136v does not contain a requirement like the Acne Monograph that each product be also in compliance with "each general condition established in § 330.1 of this chapter." 21 C.F.R. § 333.301(a). Furthermore, the relevant preemption statute here does not include explicit preemption of labeling or packing requirements *in toto*. 21 U.S.C. § 379r. In addition to this critical distinction in statutory language, the Supreme Court also noted in Durnell that there is an entirely different process regarding labeling in cases involving pesticide—namely, the EPA must approve a pesticide's label. Durnell, 146 S. Ct. at 2010. Moreover "[a]fter EPA approves a pesticide's label at registration, manufacturers are legally *required* to use that label—unless and until EPA approves or requires a label change and amends the pesticide's registration." Id. (emphasis in original). The Court thus summarized that "federal law require[d] [the defendant] to sell [the product] with the label that EPA approved at the initial registration and that EPA has subsequently re-approved on multiple occasions—that is, the label without a cancer warning." Id. at 2011. Though a case involving the discussion and application of preemption principles generally, Durnell is not persuasive.

Walgreens also directs the Court to Brower v. Colgate-Palmolive Co., a class action involving allegations that the defendant's toothpaste contained heavy metals. No. 25-cv-03348 (JPO), 2026 WL 1831253, at *1 (S.D.N.Y. June 25, 2026). That case too involved the preemption statute 21 U.S.C. § 379r as well as a monograph that covered anticaries. Id. at *4. Though the court cited Durnell favorably in its recitation of preemption, it did not necessarily incorporate its reasoning whole cloth into its analysis. See id. at *3. Critically, the Brower court did not address the issue of the anticaries monograph incorporating § 330.1, just like the Acne Monograph does. In fact, the anticaries monograph is nearly identical to the Acne Monograph in this respect:

> An over-the-counter anticaries drug product in a form suitable for topical administration to the teeth is generally recognized as safe and effective and is not misbranded if it meets each condition in this part **and** each general condition established in § 330.1 of this chapter.

21 C.F.R. § 355.1 (emphasis added). Because the Brower court did not address this issue, the

Court finds it unpersuasive on this issue.

The Court finds that Plaintiffs' misbranding claim is not categorically preempted.

### 3. Preemption and Adulteration Theory

Plaintiffs argue that they have pleaded three adulteration theories of contamination pursuant to 21 U.S.C. § 351(a)(1), § 351(b), and § 351(a)(2)(B). In order to understand these theories, the Court again begins with the relevant statutes.

> A drug or device shall be deemed to be adulterated—
>
> **(a) Poisonous, insanitary, etc., ingredients; adequate controls in manufacture**
>
> (1) If it consists in whole or in part of any filthy, putrid, or decomposed substance; . . . or
>
> [(2)](B) if it is a drug and the methods used in, or the facilities or controls used for, its manufacture, processing, packing, or holding do not conform to or are not operated or administered in conformity with current good manufacturing practice to assure that such drug meets the requirements of this chapter as to safety and has the identity and strength, and meets the quality and purity characteristics, which it purports or is represented to possess . . . .

21 U.S.C. §§ 351(a)(1), (a)(2)(B); (see ECF No. 46-2, ¶¶ 104, 117.).

> **(b) Strength, quality, or purity differing from official compendium**
>
> If it purports to be or is represented as a drug the name of which is recognized in an official compendium, and its strength differs from, or its quality or purity falls below, the standard set forth in such compendium. Such determination as to strength, quality, or purity shall be made in accordance with the tests or methods of assay set forth in such compendium, except that whenever tests or methods of assay have not been prescribed in such compendium, or such tests or methods of assay as are prescribed are, in the judgment of the Secretary, insufficient for the making of such determination, the Secretary shall bring such fact to the attention of the appropriate body charged with the revision of such compendium, and if such body fails within a reasonable time to prescribe tests or methods of assay which, in the judgment of the Secretary, are sufficient for purposes of this paragraph, then the Secretary shall promulgate regulations prescribing appropriate tests or methods of assay in accordance with which such determination as to strength, quality, or purity shall be made. No drug defined in an official compendium shall be deemed to be adulterated under this paragraph because it differs from the standard of strength, quality, or purity therefor set forth in such compendium, if its difference in strength, quality, or purity from such standard is plainly stated on its label. Whenever a drug is recognized in both

> the United States Pharmacopœia and the Homœopathic Pharmacopœia of the United States it shall be subject to the requirements of the United States Pharmacopœia unless it is labeled and offered for sale as a homœopathic drug, in which case it shall be subject to the provisions of the Homœopathic Pharmacopœia of the United States and not to those of the United States Pharmacopœia.

21 U.S.C. § 351(b); (see ECF No. 46-2, ¶¶ 105, 106, 126, 127.)

At times, the parties have argued past each other. For example, Walgreens generally contends that Plaintiffs' adulteration theory must fail because it is preempted. In opposition, Plaintiffs gave clarification that their adulteration theory is actually a set of three theories, all of which support finding that preemption does not apply. In reply, Walgreens doubles down, arguing that the issue of preemption and an adulteration theory is straightforward (and addressing Plaintiffs' USP theory).

In order for clarity, the Court takes each theory in turn, summarizing Plaintiffs' theories before analyzing whether preemption applies.

**a. Theory of Adulteration: § 351(b) (and the USP)**[4]

The Court begins with Plaintiffs' theory of adulteration based on § 351(b), which provides that a drug is adulterated "[i]f it purports to be or is represented as a drug the name of which is recognized in an official compendium, and its strength differs from, or its quality or purity falls below, the standard set forth in such compendium. . . ." 21 U.S.C. § 351(b). Plaintiffs assert that the USP is an official compendium and therefore, the requirements in the USP are 'incorporated' into the FDCA. In order to understand this theory, the Court once more outlines the pathway below.

Title 21 U.S.C. § 321(j) provides:

> The term 'official compendium' means the official United States Pharmacopœia, official Homœopathic Pharmacopœia of the United

[4] In their opposition, Plaintiffs took the curious position that in their view, the Walgreens had 'conceded' Plaintiffs' theory under § 351(b) but not bringing it up directly in its motion. This is a risky position to take. The Court knows of no rule or precedent that would require it, and an opposing party, to bury a head in the sand. Though the party presentation rule requires that the Court rule on only issues presented to it, nothing in this concept would not allow a court to require supplemental briefing or allow for argument at a hearing in order to afford due process on such arguments. At least in this Court, procedural "gothca" games are not generally tolerated. In any event, this argument was fully explored at the hearing.

> States, official National Formulary, or any supplement to any of them.

Of course, the USP, or United States Pharmacopœia, is explicitly listed in § 321(j). Plaintiffs then cite to USP General Notice 5.60.20, which provides:

> All USP and NF articles are subject to relevant control of residual solvents, even when no test is specified in the individual monograph. If solvents are used during production, they must be of suitable quality. In addition, the toxicity and residual level of each solvent shall be taken into consideration, and the solvents limited according to the principles defined and the requirements specified in Residual Solvents ⟨467⟩, using the general methods presented therein or other suitable methods.

In turn, USP Chapter ⟨467⟩, Residual Solvents, provides "[f]or pharmacopeial purposes, residual solvents in pharmaceuticals are defined as organic volatile chemicals that are used or produced in the manufacturing of drug substances, excipients, or dietary ingredients, or in the preparation of drug products or dietary supplement products." (2025 USP, p. 2.)[5] USP Chapter ⟨467⟩, Residual Solvents, Table 2, states that benzene is a solvent with a "concentration limit (ppm)" of 2 because it is a "carcinogen." (Id. at p. 5.)

In short, Plaintiffs contend that the FDCA incorporates the USP, and the USP includes Chapter ⟨467⟩, which provides a limit of 2 ppm to benzene.

Walgreens disagrees, arguing that USP Chapter ⟨467⟩ is not incorporated into the FDCA and even if it were applicable, it applies only to "residual solvents," which are "organic volatile chemicals that are used or produced in the manufacturing of drug substances." (ECF No. 58, p. 6.) Walgreens offers that benzene is not an intentional ingredient or solvent used in the manufacturing of BPO products, so the 2-ppm limit does not apply here.

This Court previously found that Plaintiffs did not allege any binding regulatory benzene safety threshold, 2 ppm or otherwise, applicable to defendant's BPO products. Plaintiffs have now identified a pathway to incorporate the 2-ppm limit, which the Court must analyze. The Court begins with the language of the USP before returning to the language of the statute.

---

[5] Walgreens moved for judicial notice of the 2008 version of Chapter ⟨467⟩ from the USP and Plaintiffs moved for judicial notice of the 2025 version. (Compare ECF No. 59 with ECF No. 57-1.) The Court finds it appropriate to utilize the 2025 version of the USP because it is the most up to date version. Thus, the Court cites to ECF No. 57-1, hereinafter, "2025 USP."

Regarding the USP, the key language (at first blush) is the "definition" of a residual solvent, which is "organic volatile chemicals that are used or produced in the manufacturing of drug substances . . . ." (2025 USP, p. 2.) The Court notes that there are no allegations that Walgreens used benzene as a solvent in its manufacturing of its BPO products. Next, though nuanced, the Court uses the common definitions of the words "produce" and "manufacturing" and finds that the phrase "produced in the manufacturing" to be "to [have] cause[d] to have existence or to happen"[6] in "the act or process of producing something."[7] Thus, this seems to support Walgreens' position.

Importantly, however, the Court has reviewed a section of USP Chapter ⟨467⟩ that discusses the Classification of Residual Solvents by Risk Assessment. (2025 USP, p. 3.) In that section, it is noted that there are three potential sources of residual solvents in pharmaceutical drug products. As relevant here, the first category, "drug substance or dietary active ingredient," states that "[p]otential solvent sources include their use or formation during the synthesis or purification of the drug substance; their presence in raw materials or reagents used in their synthesis; or *degradation of the drug substance*." (Id.) (emphasis added). In other words, it appears that USP Chapter ⟨467⟩ explicitly contemplates drug degradation as a source of residual solvents. Therefore, there is an ambiguity between USP Chapter ⟨467⟩'s apparent definition of "residual solvents" and later discussions explicitly including degradation. On a motion to dismiss, the Court must view the facts in the light best for the nonmovant, and therefore, the Court finds that USP Chapter ⟨467⟩ arguably covers degradation of the drug substances.

With this finding, the Court is required to address Walgreens's argument, that even assuming the USP Chapter ⟨467⟩ creates a 2-ppm limitation in the degradation of BPO, § 351(b) does not generally incorporate the USP generally as Plaintiffs have posited. In support, Walgreens contends that § 351(b) provides that a drug is adulterated if it is represented as a drug recognized in an official compendium, but its "strength differs from, or its quality or purity falls below, the

---

[6]"Produce." Merriam-Webster.com Dictionary, Merriam-Webster, https://www.merriamwebster.com/dictionary/produce. (last accessed June 4, 2026).

[7]"Manufacture." Merriam-Webster.com Dictionary, Merriam-Webster, https://www.merriam-webster.com/dictionary/manufacture. (last accessed June 4, 2026).

standard set forth in such compendium." 21 U.S.C. § 351(b). Therefore, Walgreens contends that § 351(b) is concerned with drugs whose strength, quality, or purity are misrepresented—not with drugs that allegedly contain a contaminant.

Though a close call, the Court is persuaded with Plaintiffs' position. The Court takes Walgreens' position that § 351(b) is concerned about the drug strength or quality being misrepresented. However, the Court cannot ignore that the term "purity" is also used. Thus, condensing the plain words of the statute: "a drug is adulterated . . . if . . . its purity falls below, the standard set forth in [the USP]." 21 U.S.C. § 351(b). Thus, it appears that if an applicable drug falls below the purity requirements of the USP, the statute states that such drug is adulterated.

Plaintiffs have made such allegations, and therefore, the Court is persuaded that this theory of adulteration is not preempted.

**b. Theory of Adulteration: § 351(a)(2)(B) and cGMPs**

Notwithstanding the Court's previous determination that claims based on violations of cGMPs are "not categorically preempted," Walgreens argues now that the "practical effect of accepting Plaintiffs' allegations would be to require Walgreens to either reformulate the Products to prevent alleged benzene formation or withdraw from the market entirely—outcomes that are preempted by the 2020 Monograph." (ECF No. 54, p. 19-21.)

Plaintiffs address failure to state a claim under cGMPs with Walgreens' renewed preemption argument. (ECF No. 57, pp. 8-13.) The Court addresses preemption in this section. Essentially, Plaintiffs explain that the operative complaint does not allege that Walgreens will be *required* to anything as Walgreens has suggested. Rather, Plaintiffs again explain how in their view a BPO Product is not GRASE if it is not manufactured in compliance with the cGMPs. Plaintiffs then explain the duties the cGMPs place on Walgreens and how, in their view, Walgreens violated them.

The Court again finds that Plaintiffs continue to have the better argument. To begin with, it does not appear that Walgreens disputes the Court's previous finding. Rather, Walgreens asks the Court to look at outcomes for Walgreens should Plaintiffs' claims be meritorious (*i.e.*, implied preemption). Of course, in order to follow this logic, Walgreens's argument relies on the

assumption that the Acne Monograph requires only compliance with itself, and only its first clause of 21 C.F.R. § 333.301(a). But as explained in detail above, the Acne Monograph requires compliance not only with the Monograph but "each general condition established in § 330.1." In turn, a drug is deemed adulterated "if it is a drug and the methods used in, or the facilities or controls used for, its manufacture, processing, packing, or holding do not conform to or are not operated or administered in conformity *with current good manufacturing practice* to assure that such drug meets the requirements of this chapter as to safety and has the identity and strength, and meets the quality and purity characteristics, which it purports or is represented to possess." 21 U.S.C. § 351(a)(2)(B) (emphasis added).

To be sure, the Court previously found that, based on the arguments before it, that requiring a label, based on solely the first clause of Acne Monograph, appeared to be preempted by 21 U.S.C. § 379r(a) because it would require a reformulation of the BPO product. Yet, this time around, Plaintiffs have plausibly alleged that the Acne Monograph also requires compliance with Chapter V general labeling requirements. That Walgreens might need to reformulate its BPO products to be in compliance with the Acne Monograph itself does not appear to be "in addition" to federal law, but rather, as Plaintiffs argue, merely acting in compliance with the law.

Thus, the Court again finds that Plaintiffs cGMP claims are not categorically preempted.

**c. Theory of Adulteration: § 351(a)**

This final theory relies on § 351(a), which provides that "[i]f [a drug] consists in whole or in part of any filthy, putrid, or decomposed substance," then it is adulterated. In support of this theory, Plaintiff highlights that they have alleged that BPO degrades into benzene and that the FDA has even issued recalls and guidance regarding benzene in BPO products generally. (ECF No. 57, pp. 3-8.) Thus, Plaintiffs argue that that the extent they raise parallel claims based on this definition of adulteration, this theory is not preempted. Because the Court has revised its previous determination with regard to Plaintiffs' misbranding claim, the Court agrees with Plaintiffs that this theory—for substantially similar reasons discussed above—is not preempted.

Again, the Court is not persuaded by Walgreens's contention that were Plaintiffs successful, Walgreens would be required to do something "in addition to" federal law. Rather, this

theory is straightforward: because the BPO products allegedly contained benzene, they were adulterated. The Court has already explained how the Acne Monograph includes compliance with each general condition established in § 330.1, which includes compliance with § 351(a).

This theory too is not preempted.[8]

**4. Parallelism**

A significant issue hinted at but not fully briefed by the parties is parallelism. As a reminder, § 379r does not preempt claims under state law that impose identical or "parallel" requirements to FDA regulations. Riegel v. Medtronic, 552 U.S. 312, 330 (2008). Upon review of the operative complaint, it appears that Plaintiffs have alleged statutes that support parallel claims for their theories of adulteration, misbranding, and violations of cGMPs. (See ECF No. 46-2, ¶ 166.) Walgreens did dispute parallelism in either its motion or reply.

Accordingly, to the extent Plaintiffs' claims require parallel state statutes, the Court finds that Plaintiffs have sufficiently alleged as such. Any such nuance on whether a statute is actually parallel may nonetheless be raised in a later at class certification or on a dispositive motion.

* * *

In sum, the Court is now persuaded that Plaintiffs have alleged that none of their theories of liability are preempted and that there are parallel state statutes that support such potential claims. Thus, the Court will recommend that Walgreens's motion to dismiss be denied as to preemption.

**C. Primary Jurisdiction Doctrine**

In renewing the preemption discussion, Walgreens wishes to again press its argument that notwithstanding the Court's determination regarding preemption, this matter should be dismissed "because the questions presented in this case are within the primary jurisdiction of FDA." (ECF No. 54, p. 20.) Plaintiffs oppose, arguing that the primary jurisdiction doctrine is a permissive doctrine that is inapplicable to the case at bar. (ECF No. 57, pp. 22-23.) The Court agrees with Plaintiffs.

"The primary jurisdiction doctrine allows courts to stay proceedings or to dismiss a

[8] Because the Court has found that these theories are not preempted, the Court need not reach Plaintiffs' alternative argument that 'prohibiting Walgreens from warning about benzene on its labeling is an unconstitutional prior restraint on free speech.' (ECF No. 57, pp. 19-22.)

complaint without prejudice pending the resolution of an issue within the special competence of an administrative agency. Clark v. Time Warner Cable, 523 F.3d 1110, 1114 (9th Cir. 2008). "A court's invocation of the doctrine does not indicate that it lacks jurisdiction." Id., citing Reiter v. Cooper, 507 U.S. 258, 268-69 (1993). Rather, the doctrine is a "prudential" one, "under which a court determines that an otherwise cognizable claim implicates technical and policy questions that should be addressed in the first instance by the agency with regulatory authority over the relevant industry rather than by the judicial branch." Id., citing Syntek Semiconductor Co., Ltd. v. Microchip Technology, Inc., 307 F.3d 775, 780 (9th Cir. 2002).

"Primary jurisdiction applies in a limited set of circumstances." Id. For example, "the doctrine is not designed to 'secure expert advice' from agencies 'every time a court is presented with an issue conceivably within the agency's ambit.'" Id., quoting Brown v. MCI WorldCom Network Servs., 277 F.3d 1166, 1172 (9th Cir. 2002); see also Reid v. Johnson & Johnson, 780 F.3d 952, 966 (9th Cir. 2015). Rather, "it is to be used only if a claim 'requires resolution of an issue of first impression, or of a particularly complicated issue that Congress has committed to a regulatory agency, . . . and if 'protection of the integrity of a regulatory scheme dictates preliminary resort to the agency which administers the scheme.'" Id., quoting Brown, 277 F.3d at 1172, and United States v. General Dynamics Crop., 828 F.2d 1356, 1362 (9th Cir. 1987).

When a district court determines that primary jurisdiction applies, it enables a "referral" of the issue to the relevant agency. Id. at 1115, quoting Reiter, 507 U.S. at 268. Thus, "this means that the court either stays proceedings or dismisses the case without prejudice, so that the parties may seek an administrative ruling." Id., citing Syntek, 307 F.3d at 782 n.3. "'[T]here is no formal transfer mechanism between the courts and the agency'; rather, the parties are responsible for initiating administrative proceedings themselves.'" Id. (brackets in original), quoting Syntek, 307 F.3d at 782 n.3.

The Ninth Circuit has "held that the doctrine applies in cases where there is: '(1)[a] need to resolve an issue that (2) has been placed by Congress within the jurisdiction of an administrative body having regulatory authority (3) pursuant to a statute that subjects an industry or activity to a comprehensive regulatory authority that (4) requires expertise or uniformity in

administration." Id., quoting Syntek, 307 F.3d at 781 (brackets in original). That said, "[t]he 'deciding factor' in determining whether the primary jurisdiction doctrine should apply is 'efficiency.'" Reid, 780 F.3d at 967, quoting Rhoades v. Avon Prods., Inc., 504 F.3d 1151, 1165 (9th Cir. 2007). In considering these factors, the Ninth Circuit has explained that "the primary jurisdiction doctrine is designed to protect agencies possessing 'quasi-legislative powers' and that are 'actively involved in the administration of regulatory statutes.'" Id., quoting General Dynamics, 828 F.2d at 1365.

Here, the Court finds that the FDA is an agency with quasi-legislative powers and is actively involved in the administration of regulatory statutes, namely the FDCA and the OTC Acne Monograph. Plaintiffs argue that there is no need to even involve the expertise of the FDA because, in Plaintiffs' view, "[e]ven if the FDA issued a rule, it would not address the claims alleged here, which seek to recover money spent on adulterated and misbranded BPO products." (ECF No. 57, p. 23.)

The Court is not persuaded by Walgreens' argument. Whether and to what extent the 2-ppm benzene limit is incorporated into the FDCA is a legal question within the competency of the Court. Furthermore, the Court is not persuaded that staying this action will accomplish any efficiency. Though the Valisure Petition has been filed, Walgreens has offered nothing in the way that the Petition would be addressed in the near future or that the exact issues in this case would necessarily be ruled on. The legal and factual issues this case presents may be complex, but they are not beyond a court's conventional experience.

For these reasons, the Court finds that Plaintiffs have the better argument here. The Court will recommend denying Walgreens' request to stay this matter under the primary jurisdiction doctrine.

**C. Failure to State a Claim: cGMPs, Rule 8 Plausibility, and Rule 9(b)**

Having addressed the threshold arguments regarding preemption, the Court next addresses Walgreens' argument that Plaintiffs have nonetheless failed to state a claim for violations of cGMPs. (ECF No. 54, pp. 12-13.) Plaintiffs have now identified six categories of cGMPs that Walgreens has purportedly violated: product specifications, temperature controls, stability testing,

treatment of contaminated batches, expiration dates, and failure to reject contaminate batches. (See ECF No. 46-2, ¶ 124.) Notwithstanding this narrowing of cGMPs, Walgreens argues that Plaintiffs have failed to allege facts that Walgreens violated the cGMPs at issue, as well as failed to allege such violations resulted in all the BPO products at issue being contaminated with benzene at levels exceeding 2 ppm. (See ECF No. 54, pp. 10-13.)

Plaintiffs oppose, arguing that they have now "ma[de] sure to allege cGMP violations beyond a conclusory list of violated regulations." (ECF No. 57, p. 9.) Essentially, Plaintiffs assert that they have sufficiently alleged that Walgreens had duties involving testing, storage, and oversight of its BPO products, including whether benzene was in its products. (Id.) Plaintiffs then direct the Court to their previous arguments regarding the USP and its incorporation into the FDCA. (Id. at pp. 9-10.) Plaintiffs then discuss that from their allegations they have plausibly alleged that "[Walgreens] breached 21 C.F.R. §§ 211.84, 211.160, and 211.165 by failing to conduct mandatory stability and batch testing for benzene—a contaminant known to result from BPO degradation and that the FDA specifically instructed Defendant to test for." (Id. at pp. 12-13.) Finally, Plaintiffs cite to the testing conducted by Plaintiff Giarrizzo. (Id. at p. 13) The Court agrees with Plaintiffs.

The parties seemingly agree that this issue seemingly boils down to the allegations outlined in paragraph 124 of the operative complaint, which the Court quotes below:

> 124. Thus, upon information and belief, based on the high levels of benzene discovered in testing and the chemical instability of Defendant's formulation, Defendant violated the following California state law requirements, which parallel and incorporate federal cGMPs (as expressly incorporated into California law by the Sherman Food, Drug, and Cosmetic Law, Cal. Health & Safety Code §§ 109875 and 110100):
>
> **a. Failure to Establish Scientifically Sound Specifications (21 C.F.R. §§ 211.160, 211.87).** Defendant was required to establish laboratory controls and "scientifically sound and appropriate specifications, standards, sampling plans, and test procedures designed to assure" that its components—including the active ingredient, raw BPO–conform to appropriate standards of identity, strength, quality, and purity. However, upon information and belief, Defendant failed to assure component purity for BPO via mandated testing and retesting procedures. Because raw BPO is stable up to 98°C, upon information and belief, Defendant did not establish specifications for raw BPO and did not conduct

retesting of BPO, which is known to be "subject to deterioration" into benzene due to heat exposure during shipping or storage, to ensure they were free from benzene precursors or existing contamination. Moreover, upon information and belief, Defendant failed to establish necessary purity specifications for known degradants. Because it has been known since at least 1936 that the BPO molecule is thermally unstable and degrades into benzene, a "scientifically sound" specification must include a maximum threshold for benzene formation (2 ppm)—the limit set by the FDA that manufacturers must adopt. Upon information and belief, Defendant failed to establish any such purity standard for benzene, choosing instead to ignore a known chemical pathway in favor of cheaper, less rigorous testing protocols.

**b. Failure to Maintain Facilities and Temperature Controls (21 C.F.R. §§ 211.142 & 211.42)**. cGMPs require the storage of drugs under appropriate conditions of temperature and humidity so that purity is not affected. The instability in Walgreens' products arises due to, in part, improper manufacturing or holding conditions (e.g., improperly refrigerated shipping or warehouse storage). Upon information and belief, Defendant violated the cGMPs by shipping and holding BPO Products in inadequately refrigerated environments, effectively catalyzing the formation of benzene before the product reached Plaintiffs.

**c. Failure to Utilize "Meaningful and Specific" Stability Test Methods (21 C.F.R. § 211.166).** Stability testing must be done using "reliable, meaningful, and specific test methods." Upon information and belief, Defendant's stability program was designed to be willfully blind to the purity regarding the carcinogenic byproduct, benzene. A stability test that ignores a documented degradation pathway known since 1936 and was flagged repeatedly by the FDA is, by definition, not "meaningful" or "specific."

**d. Failure to Test Components and Reject Adulterated Lots (§ 211.84(d)):** cGMPs require that components—such as BPO—be tested for conformity with written specifications for purity and quality before release or sale for use. Upon information and belief, Defendant failed to appropriately and adequately test its active ingredient BPO for the presence of benzene in violation of the affirmative testing duties mandated by cGMPs. Had Defendant adequately tested its BPO Products for benzene, it would have discovered that its Products contained benzene at levels above even the FDA's "safe harbor" exception limit of 2 ppm, making the Products illegal to distribute, market, and sell, thus warranting a recall.

**e. Expiration Dates Not Supported by Stability Data (21 CFR § 211.137).** Defendant is required under cGMPs to ensure that its products meet standards of purity at the time of consumer use, which in turn requires assigning an expiration date supported by stability data. Stability testing must evaluate whether the drug product remains safe and pure throughout its shelf life under all expected distributor and consumer storage, handling, and use

> conditions, using "reliable, meaningful, and specific" test methods. It is well known that chemical ingredients may degrade over time or in response to environmental factors such as temperature, light, moisture, and humidity, and any stability testing demonstrating degradation or formation of toxic byproducts renders the product unfit for sale. This requires an expiration date related to the specific storage conditions on the label. Upon information and belief, Defendant's 2-to-3-year expiration dates are legally invalid because they are not supported by data showing that the BPO Products remain below 2 ppm benzene when stored over that time period. By failing to conduct relevant stability testing, and by marketing products whose formulation cannot maintain purity over their normal shelf life, Defendant ensured that the BPO Products were adulterated by the time they reached Plaintiffs' hands, in additional violation of cGMPs.
>
> **f. Failure to Reject Contaminated Batches (21 C.F.R. §§ 211.165 & 211.192).** The cGMPs require that each batch be tested prior to release and that any batch showing an unexplained discrepancy or failure to meet specifications be rejected. Because Defendant's BPO Products are "fundamentally unstable," any batch subjected to standard accelerated stability testing (e.g., 50°C for 18 days) would have revealed benzene levels hundreds of times higher than the 2 ppm limit. But, upon information and belief, Defendant skipped these mandated tests for the specific batches purchased by Plaintiffs, and illegally released the contaminated batches anyway.

(ECF No. 46-2, ¶ 124(a)-(f).)

Walgreens's argument breaks down into two aspects. First, Walgreens argues that Plaintiffs have failed to meet the plausibility standard in Rule 8 because their logic undergirding their claims remains circular. Second, Walgreens contends that Plaintiffs have still failed to allege (or support) factual allegations that show "how" Walgreens violated the cGMPs, implicating the heightened pleading standard of Federal Rule of Civil Procedure 9(b). The Court finds that these collapse into each other and therefore addresses them together.

To start, the Court observes that in its last findings and recommendations, it was concerned that it seemed as if Plaintiffs had merely listed various cGMPs that they then alleged Walgreens had violated. In other words, it appeared as if Plaintiffs had thrown spaghetti against the wall, attempting to see what would stick. See Navarro v. Walgreens Boots Alliance, Inc., No. 1:24-cv-00290-JLT-SAB, 2025 WL 1411406, at *13-14 (E.D. Cal. May 15, 2025). In particular, with such broad pleading, it was unclear to the Court that Plaintiffs had put Walgreens on notice of how it had purportedly violated any cGMPs. Id.

In light of the allegations above, as well as the operative complaint generally, the Court is satisfied that Plaintiffs have sufficiently identified cGMPs in a way that puts Walgreens on notice of how it allegedly violated such cGMPs. For example, paragraph 124, subsection (a), outlines that Walgreens was required to establish laboratory controls and "scientifically sound and appropriate specifications, standards, sampling plans, and test procedures designed to assure" that its components—including the active ingredient, raw BPO–conform to appropriate standards of identity, strength, quality, and purity. Plaintiffs then allege that Walgreens failed to assure component purity for BPO via mandated testing and retesting procedures. Specifically, because raw BPO is stable up to 98°C, Plaintiffs allege that Walgreens did not establish specifications for raw BPO and did not conduct retesting of BPO, which is known to be "subject to deterioration" into benzene due to heat exposure during shipping or storage, to ensure they were free from benzene precursors or existing contamination. Plaintiffs allege that Walgreens failed to establish necessary purity specifications for known degradants and failed to establish any such purity standard for benzene. Subsections (c) and (d) likewise invoke specific types of testing procedures not created or implemented. Meanwhile, subsection (b) addresses storage of BPO, subsection (e) addresses that Walgreens's BPO products' expiration dates are not supported by stability testing, and subsection (f) addresses failure to reject contaminated batches.

Thus, as the parties are aware, the crux of this motion boils down to the issue of plausibility. In addition to the Valisure study and FDA alerts, Plaintiffs' have included allegations that Plaintiff Giarrizo had her BPO product tested: "Following the public disclosures regarding BPO instability, Plaintiff Giarrizzo had her personal, unused portion of Walgreens Tinted Acne Treatment Cream (Exp. 12/26) independently tested by a qualified analytical laboratory. On March 31, 2025, the analysis revealed that the product contained a staggering 176.48 ppm of benzene—more than 88 times the FDA's 2 ppm 'safe harbor' limit for unavoidable contamination." (ECF No. 46-2, ¶ 16.)

Plaintiffs thus explain that "[t]he documented presence of benzene on retail shelves—confirmed by Plaintiff Giarrizzo, Valisure, and the 2025 recall—is the logical necessity of a failure to test and a failure to reject contaminated batches." (ECF No. 57, p. 13.) In other words,

Plaintiffs suggest that their allegations sufficiently support an inference that Walgreens plausibly violated the identified cGMPs. The Court agrees. Plaintiffs have nudged their claims "across the line from conceivable to plausible." See Iqbal, 556 U.S. at 680. Furthermore, by alleging the "how," Plaintiffs meet Walgreens's Rule 9(b) concern.

That Walgreens takes issue that some of Plaintiffs allegations are "on information and belief," is not persuasive under the circumstances of this case. "The Twombly plausibility standard . . . does not prevent a plaintiff from pleading facts alleged upon information and belief where the facts are peculiarly within the possession and control of the defendant or where the belief is based on factual information that makes the inference of culpability plausible." Soo Park v. Thompson, 851 F.3d 910, 928 (9th Cir. 2017), quoting Arista Records, LLC v. Doe 3, 604 F.3d 110, 120 (2d Cir. 2010). Because many of the relevant facts here are known only to Walgreens, and in light of all the allegations in the operative complaint, the Court concludes that Plaintiffs have pleaded sufficient facts to state plausible claims pursuant to violation of cGMPs. See id.

Walgreens' offered precedent is distinguishable or not persuasive. In Ebrahimi v. Mentor Worldwide LLC, the Ninth Circuit, in a memorandum opinion, affirmed the district court's dismissal of the plaintiff's medical device claim. 804 Fed. Appx. 871 (9th Cir. 2020) (mem.). The plaintiff "essentially contend[ed] that the court [could] plausibly infer that [the defendant] must have violated at least one of the FDA's CGMPs by not catching her allegedly defective [breast] implants." Id. at 872. The Court observed that "mere allegations 'suggesting that [the plaintiff's] particular breast implant[s] w[ere] defective does not show that [the defendant] failed to comply with the FDA's Current Good Manufacturing Practices.'" Id., quoting Weber, 940 F.3d at 1114. As should be apparent, the Court has found that Plaintiffs here have not provided mere allegations suggesting Walgreens's BPO was defective and therefore Walgreens must have violated cGMPs. In particular, Ebrahimi seemingly involved only one plaintiff with one purportedly defective product. Meanwhile, Plaintiffs have alleged multiple instances of benzene detection in BPO products, via the Valisure study and Plaintiff Giarrizzo's independent testing.

While Walgreens cites to Weber, the Court notes that even Weber was decided on summary judgment, not a motion to dismiss. Weber v. Allergan, Inc., 940 F.3d 1106, 1114 (9th

Cir. 2019). In any event, the only evidence offered on behalf of the plaintiff in Weber relating to a defective medical device was an expert opinion that "[the plaintiff's] right implant's gel bleed exceeding the amount specified by its product labeling constituted a 'departure from the manufacturer's specifications' and a 'defect.'" Id. at 1113. The Ninth Circuit observed that this "opinion that the implant was defective and malfunctioned is not evidence that [the defendant] deviated from the FDA's pre-market approved procedures. *Res ipsa loquitor* is not enough to survive MDA preemption." Id. The Court finds this reasoning in line with Ebrahimi, where evidence of one defect was not enough.

In support, Plaintiffs have directed the Court to two cases in support. In In re Chantix, the court observed that while courts have rejected generalized references to cGMPs, "courts have recognized that allegations predicated on specific cGMPs, as incorporated by parallel state regulatory frameworks, may 'survive preemption at the motion to dismiss stage.'" In re Chantix, 735 F. Supp. 3d 352, 388-89 (S.D.N.Y. 2024). The court then observed that the plaintiffs had made at least two specific cGMP accusations and noted that the plaintiffs had alleged that "contaminated batches of Chantix were able to reach the market, notwithstanding the FDA's guidelines regarding the acceptable levels of nitrosamines, indicates that there was a breakdown in Defendant's quality control and testing protocols as required by these cGMPs and incorporated by state law." Id. at 389. The court noted that while it found the allegations to be sufficient to pass a motion to dismiss, following discovery a different conclusion might lie. Id.

Plaintiffs also direct the Court to Clinger v. Edgewell Personal Care Brands, LLC, a case involving sunscreen that allegedly contained benzene. No. 3:21-cv-1040 (JAM), 2023 WL 2477499 (D. Conn. Mar. 13, 2023). As with this case, Clinger also involved a monograph and a Valisure study. Id. at *1. The court in Clinger found that "it is reasonable to assume that benzene did not magically appear in Banana Boat products. It must have appeared by reason of some aspect of the manufacturing process." Id. at *4. "Of course, if the plaintiffs were able to show that the sunscreen products that they bought came from the very same batch or lot of a sunscreen product that was found to be contaminated with benzene, this would make it highly likely that the product purchased by the plaintiffs also contained benzene." Id. "Yet, even in the

absence of linkage to a particular batch or lot, it is reasonable to assume that the same product line would involve the same manufacturing process and with the same likelihood of residual benzene contamination even if not every batch is contaminated." Id. Thus, the Court found that it was at least plausible to conclude that the products purchased by the plaintiffs were also contaminated with benzene. Id. Clinger too gave an admonition to the plaintiffs, noting that they "may have difficulty carrying their burden of proof on this fact issue by a preponderance of the evidence unless they have additional evidence to show a correlation between benzene and particular product lines." Id.

The Court finds Plaintiffs' offered precedent persuasive insofar that they have adequately pleaded claims based on violations of cGMPs. That said, the Court also agrees with the admonition in Clinger, but that is an issue for the future.

Based on the foregoing, the Court will recommend denying this aspect of Walgreens's motion to dismiss.

**D. Failure to State a Claim: Labeling and Puffery**

Walgreens takes three positions on the labeling Plaintiffs have identified. First, Walgreens argues that the claims at issue lack specificity or measurability. Second, Walgreens contends that certain labels identified constitute puffery. Third, even assuming the Court were to disagree with the first two arguments, Walgreens argues that the operative complaint lacks sufficient factual allegations and, "it simply is not plausible that the real reason they bought the BPO Products was because of 'broad claims' about the safety of the Walgreens brand on Walgreens' website . . . ." (ECF No. 54, p. 17.) Plaintiffs counter with that the labeling identified is measurable and specific, thus, the labeling is neither puffery nor insufficiently pleaded otherwise. (ECF No. 57, pp. 18-19.) The Court agrees generally with Plaintiffs except for one label discussed below.

Chapter V of the FDCA generally prohibits the misbranding of drugs. 21 U.S.C. § 352. A drug is misbranded if its labeling is false or misleading in any particular. Id. The Ninth Circuit has made clear that state causes of action alleging that a label is "false or misleading in any particular" are not generally preempted by the FDCA even if there is not a specific FDA regulation prohibiting the statement. See Astiana v. Hain Celestial Grp., Inc., 783 F.3d 753, 758-59 (9th Cir.

2015) (in context of cosmetics), *abrogated on other grounds by* Hartford Casualty Ins. Co. v. J.R. Marketing, L.L.C., 61 Cal. 4th 988, 353 P.3d 319 (Cal. 2015). As discussed above, OTC acne medications must meet the general conditions established in Section 330.1 in order to not be misbranded. 21 C.F.R. § 341.1; 21 C.F.R. § 330.1. That is, OTC acne medications, among other requirements, must not contain labeling that is false or misleading in any particular.

"To be actionable as an affirmative misrepresentation, a statement must make a 'specific and measurable claim, capable of being proved false or of being reasonably interpreted as a statement of objective fact.'" Vitt v. Apple Computer, Inc., 469 F. App'x 605, 607 (9th Cir. 2012), quoting Coastal Abstract Services v. First American Title Insurance Co., 173 F.3d 725, 731 (9th Cir. 1999). "[A] statement that is quantifiable, that makes a claim as to the 'specific or absolute characteristics of a product,' may be an actionable statement of fact while a general, subjective claim about a product is non-actionable puffery." Newcal Indus., Inc. v. Ikon Office Solutions, 513 F.3d 1038, 1053 (9th Cir. 2008), citing Cook, Perkiss & Liehe, Inc. v. Northern California Collection Services Inc., 911 F.2d 242, 245 (9th Cir. 1990). "The plaintiff must set forth what is false or misleading about a statement, and why it is false." Vess, 317 F.3d at 1106; see also Marolda v. Symantec Corp., 672 F. Supp. 2d 992, 1001 (N.D. Cal. 2009). Whether an alleged misrepresentation is an absolute statement of fact or mere puffery is a question of law appropriate for decision on a motion to dismiss. Cook, 911 F.2d at 245.

The first set of labels the Court will analyze are as follows:

> 'Walgreens brand products are authentic, tested and safe,' promising the '[s]ame active ingredients' as brand name products at a 'better price' (ECF No. 46-2, ¶ 144);
>
> Walgreens' 'suppliers 'must meet strict manufacturing criteria to ensure consistent, high-quality products for Walgreens brands' and that the Products are 'manufactured for excellence' (Id. ¶ 145); and
>
> 'Every Walgreens branded product is tested by independent third-party labs to meet safety, quality, and performance standards.' (Id. ¶ 146.)

As to whether these labels are actionable misrepresentation or puffery, the Court finds that they are actionable. Walgreens' case law is not persuasive. Sims v. Kia Motors Am., Inc., No.

SACV 13-1791 AG (DFMx), 2014 WL 12558249, at *7 (C.D. Cal. Mar. 31, 2014) (determining that statements that the defendant's products "are of 'world-class quality,' give consumers 'peace of mind,' and 'are engineered to help ensure everyone's well-being'" constitute nonactionable puffery); see also Long v. Graco Child.'s Prods., No. 13-cv-01257-WHO, 2013 WL 4655763, at *5 (N.D. Cal. Aug. 26, 2013) (explaining that words "such as 'reliable,' 'quality,' and 'performance'" are "puffery"). In neither of these cases were the labels regarding safety, manufacturing standards, or testing. Walgreens does not explain its reliance otherwise.

In any event, the Court finds that each of these labels are specific and measurable. Through discovery it will become apparent whether in fact the BPO Products were tested and met strict manufacturing criteria, leading to whether the Products were safe. See Southland Sod Farms v. Stover Seed Co., 108 F.3d 1134, 1145 (9th Cir. 1997) ("A specific and measurable advertisement claim of product superiority based on product testing is not puffery."). Furthermore, the Court finds that Plaintiffs have sufficiently alleged why these statements are false and/or misleading because, as discussed above, Plaintiffs have alleged that Walgreens' BPO Products degrade into benzene. If true, the labeling regarding safety, and by inference testing and strict manufacturing practices, would be false.

That said, the Court agrees with Walgreens that the label "Walgreens Pharmacist Recommended" is not actionable. While the label is not required by Acne Monograph or FDCA, and it appears to be a claim that could be verified, it is an opinion. See Hauter v. Zogarts, 14 Cal. 3d 104, 111, 534 P.2d 377 (1975) ("If defendants' assertion of safety is merely a statement of opinion—mere 'puffing'—they cannot be held liable for its falsity."). Furthermore, whether the BPO Products are in fact "Walgreens Pharmacist Recommended" appears to be limiting in its application. In other words, whether or not Walgreens' own pharmacists recommend Walgreens' BPO Products does not get at the issues of safety, strict manufacturing criteria, and testing. The Court takes Plaintiffs' position to be that a consumer might rely on what is perceived as an 'expert' but, as is, the label does not go further to state, for example, "Walgreens' Pharmacist Recommended as Safe." The label merely states that Walgreens' own in-house pharmacists would recommend the product. This, the Court finds to be puffery.

The Court addresses Walgreens' three final throwaway arguments on this issue. First, in a footnote, Walgreens contends that the operative complaint does not specifically allege that Plaintiffs relied on the labels. (ECF No. 54, p. 15 n.4.) The Court finds this to be a bad-faith argument. Specifically, Walgreens states that Plaintiffs have alleged that "[I]n deciding to purchase the BPO Product[s]," Plaintiffs allege only that they "reviewed the accompanying labels and disclosures . . . ." (46-2, ¶¶14-17.) This is misleading. Walgreens conspicuously omits the remainder of the allegation: "When purchasing the BPO Products, Plaintiff Navarro reviewed the accompanying labels and disclosures and understood them as representations and warranties by Defendant that the product was properly manufactured, free from defects, and safe for its intended use. Plaintiff Navarro **relied** on these representations and warranties in deciding to purchase the BPO Product and these representations and warranties were part of the basis of the bargain in that she would not have purchased, or would have paid less for, the BPO Product, if she had known of the omissions that the BPO Product was not, in fact, properly manufactured, free from defects, or safe for their intended use." (Id. at ¶ 14 (emphasis added); see id. at ¶¶ 15-17.) Therefore, this argument is of no moment.

Second, Walgreens contends that "it simply is not plausible that the real reason [Plaintiffs] bought the BPO Products was because of 'broad claims' about the safety of the Walgreens brand on Walgreens' website—on which they allege no reliance—and on the statement that the Products are 'Pharmacist Recommended.'" (ECF No. 54, p. 17.) Walgreens cites no authority that the Court, on a motion to dismiss, could simply reject allegations because the intent of the Plaintiffs "is simply not plausible." While the Court may disregard conclusory factual and legal allegations, the Court has found Plaintiffs' allegations regarding reliance to not be conclusory. Walgreens has no basis for this argument and runs counter to the standard on a motion to dismiss.

Finally, Walgreens would have the Court penalize Plaintiffs for not raising this theory in their preceding complaints. Under Foman v. Davis, 371 U.S. 178, 182 (1962), the Court previously found that Plaintiffs' should be given leave to amend in its entirety. Navarro, 2025 WL 1411406, at *16. Plaintiffs brought new aspects to their pleading (both here and elsewhere discussed in this order). The Court finds that what Plaintiffs achieved is the exact purpose of leave

to amend.

Walgreens' offered precedent is inexact and unpersuasive. Walgreens relies on Morales v. City & Cty. of San Francisco, 603 F. Supp. 3d 841, 846 (N.D. Cal. 2022), where the district court noted that "'[t]he Court does not ignore the prior allegations in determining the plausibility of the current pleadings' and is 'not required to accept as true [contradictory] allegations in an amended complaint" without more facts.'" Id. at 846, citing Stanislaus Food Prod. Co. v. USS-POSCO Indus., 782 F. Supp. 2d 1059, 1076 (E.D. Cal. 2011). Stated differently, the Morales court observed that "[a] party cannot amend pleadings to 'directly contradict[t] an earlier assertion made in the same proceeding[ ] . . . .'" Id. at 847, quoting Airs Aromatics, LLC v. Victoria's Secret Stores Brand Mgmt., Inc., 744 F.3d 595, 600 (9th Cir. 2014). Morales relied on Air Aromatics which in turn relied on Russell v. Rolfs, 893 F.2d 1033, 1037 (9th Cir. 1990), where the Ninth Circuit discussed that "[j]udicial estoppel is most commonly applied to bar a party from making a factual assertion in a legal proceeding which directly contradicts an earlier assertion made in the same proceeding or a prior one." Id. (internal quotation omitted). In other words, the Ninth Circuit noted in Russell that *judicial estoppel*, an equitable doctrine, *may* prevent contrary factual pleading.

The Supreme Court of the United States has explained that "where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him." New Hampshire v. Maine, 532 U.S. 742, 749 (2001), quoting Davis v. Wakelee, 156 U.S. 680, 689 (1895). "Because the rule is intended to prevent 'improper use of judicial machinery,' judicial estoppel 'is an equitable doctrine invoked by a court at its *discretion*.'" Id. at 750 (emphasis added) (internal citations omitted).

While Morales and Airs Aromatics obliquely discussed the issue of judicial estoppel as compulsory in those cases, the doctrine nevertheless remains discretionary. Thus, Walgreens suggestion that the Court must *never* allow for contrary pleading is inexact. Furthermore, Walgreens offers no argument on the factors that would apply to successfully invoke judicial

estoppel in this case. Significantly, the Court finds that Plaintiffs' new allegations are not even contradictory. Rather, the labeling claims are merely an expansion of their existing misbranding claims. Thus, the doctrine of judicial estoppel does not apply.

For the foregoing reasons the Court will recommend granting Walgreens' motion as to the "Walgreens Pharmacist Recommended" label and otherwise recommend denying this aspect of Walgreens' motion.

**E. Standing to Assert Claims Relating to Products Plaintiffs Did Not Purchase**

There is a split in authority among district courts in the Ninth Circuit whether a plaintiff has Article III standing to bring claims for products they did not personally purchase but that were purchased by unnamed class members. See Cordes v. Boulder Brands USA, Inc., No. CV 18-6534 PSG (JCx), 2018 WL 6714323, at *5 (C.D. Cal. Oct. 17, 2018) (collecting cases). Some courts have dismissed claims regarding non-purchased products for lack of standing. See, e.g., Lorentzen v. Kroger Co., 532 F. Supp. 3d 901, 908 (C.D. Cal. 2021) (acknowledging split of authority, stating "substantial similarity analysis appears to be inconsistent with the basic concept of standing" and dismissing claims based on non-purchased products); Missaghi v. Apple, Inc., No. CV-13-02003-GAF (AJWx), 2013 WL 12203021, at *8 (C.D. Cal. May 31, 2013) ("Plaintiff could not, as a matter of fact, have suffered injury from a product he never purchased, nor even claims to have seen advertisements concerning."); Banks v. R.C. Bigelow, Inc., 536 F. Supp. 3d 640, 650 (C.D. Cal. 2021) (denying motion to dismiss for lack of standing where plaintiffs "identified the products which they challenge and plausibly allege that the products are substantially similar" and noting defendants may raise this issue at the class certification stage). Yet, some courts had described that the "'prevailing view" in the Ninth Circuit is that class action plaintiffs can bring claims for products they did not purchase 'as long as the products and alleged misrepresentations are substantially similar.'" Id., quoting In re 5-Hour ENERGY Mktg. & Sales Practices Litig., No. MDL 13-2438 PSG (PLAx), 2014 WL 5311272, at *7 (C.D. Cal. Sept. 4, 2014).

The Court is inclined to agree with courts that found that a plaintiff may sue only on behalf of products he or she actually purchased. See TransUnion LLC v. Ramirez, 594 U.S. 413

(2021). Back to basics, in order to establish standing, "a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." Id. at 423, citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992). "[S]tanding is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek (for example, injunctive relief and damages)." Id. at 431. "Requiring a plaintiff to demonstrate a concrete and particularized injury caused by the defendant and redressable by the court ensures that federal courts decide only 'the rights of individuals.'" Id. at 423, quoting Marbury v. Madison, 1 Cranch 137, 170, 5 U.S. 137 (1803). Under Article III, "federal courts do not adjudicate hypothetical or abstract disputes." Id.

In light of these principles, the "substantial similarity" analysis appears to be inconsistent with the basic concept of standing. "The similarity of a product, by itself, says nothing about whether a party suffered an injury traceable to the allegedly wrongful conduct of another." Lorentzen, 532 F. Supp. 3d at 909. Moreover, a "substantial similarity" test into the principle of standing "overlooks this point and invites an analysis that is both difficult to apply and unrelated to its objective." Id. "That a suit may be a class action . . . adds nothing to the question of standing, for even named plaintiffs who represent a class 'must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent.'" Lewis v. Casey, 518 U.S. 343, 357 (internal citations omitted).

Here, Plaintiffs bought only Walgreens Maximum Strength Acne Foaming Wash, Walgreens Daily Creamy Benzoyl Peroxide Acne Face Wash, Walgreens Maximum Strength Walgreens Tinted Acne Treatment Cream, and Walgreens Maximum Strength Acne Gel, not the remaining products in Walgreens' BPO product line. (ECF No. 46-2, ¶¶ 14-17.) Because there is no injury alleged to the named Plaintiffs as to the other suggested products, Plaintiffs lacks standing to assert these unrelated claims.

Plaintiffs authority that this is an issue only addressed at class certification is not

persuasive. Respectfully, the Court parts ways with Davis v. The Kroger Company, No. 2:22-cv-02082-MEMF-RAOx, 2023 WL 9511156, at *14 (C.D. Cal. Sept. 23, 2023), where the district court cited to the Ninth Circuit opinion Melendres v. Arpaio, 784 F.3d 1254 (9th Cir. 2015), as requiring the issue to be decided on class certification. The Court is not convinced Melendres was intended to cover consumer protection lawsuits, or if so, whether it remains controlling following the Supreme Court's decision in TransUnion v. Ramirez. In Melendres, the procedural posture was on the defendants' appeal from a "more comprehensive permanent injunction." 784 F.3d at 1257. Part of the attack by the defendants on the injunction was arguing that "the named plaintiffs lacked standing to represent the claims of unnamed class members who were stopped, detained, or searched outside of a saturation patrol effort." Id. at 1261. The Ninth Circuit noted that there was a split in the district courts regarding whether to treat this type of issue as one of standing or one appropriate for class certification. Id. In adopting class certification approach, the Ninth Circuit was concerned that defendants would seek to end class actions where similar but not exact Fourth or Fourteenth Amendment violations might occur, but the parties involved would differ. See id. Thus, Melendres appears to be distinguishable by that fact alone.

In any event, as summarized by the Supreme Court in TransUnion:

> As the party invoking federal jurisdiction, the plaintiffs bear the burden of demonstrating that they have standing. See Lujan v. Defenders of Wildlife, 504 U.S. 555, 561, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992). Every class member must have Article III standing in order to recover individual damages. 'Article III does not give federal courts the power to order relief to any uninjured plaintiff, class action or not.' Tyson Foods, Inc. v. Bouaphakeo, 577 U.S. 442, 466, 136 S. Ct. 1036, 194 L. Ed. 2d 124 (2016) (ROBERTS, C. J., concurring). Plaintiffs must maintain their personal interest in the dispute at all stages of litigation. Davis v. Federal Election Comm'n, 554 U.S. 724, 733, 128 S. Ct. 2759, 171 L. Ed. 2d 737 (2008). A plaintiff must demonstrate standing 'with the manner and degree of evidence required at the successive stages of the litigation.' Lujan, 504 U.S., at 561, 112 S. Ct. 2130. Therefore, in a case like this that proceeds to trial, the specific facts set forth by the plaintiff to support standing 'must be supported adequately by the evidence adduced at trial.' Ibid. (internal quotation marks omitted). And standing is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek (for example, injunctive relief and damages). Davis, 554 U.S., at 734, 128 S. Ct.

> 2759; Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc., 528 U.S. 167, 185, 120 S. Ct. 693, 145 L. Ed. 2d 610 (2000).

TransUnion LLC v. Ramirez, 594 U.S. 413, 430-31 (2021).

The Court then outlined two sets of plaintiffs, one set where the plaintiffs' personally identifiable information contained an alert that was disseminated to third parties, another set where the plaintiffs' personally identifying information contained a misleading alert but was never disseminated. Id. at 432-35. The Court easily concluded that the first set of plaintiffs had standing because their information with an alter was actually disseminated to third parties. Id. at 432-33. As to the second set, the Court stated:

> Here, the 6,332 plaintiffs did not demonstrate that the risk of future harm materialized—that is, that the inaccurate OFAC alerts in their internal TransUnion credit files were ever provided to third parties or caused a denial of credit. Nor did those plaintiffs present evidence that the class members were independently harmed by their exposure to the risk itself—that is, that they suffered some other injury (such as an emotional injury) from the mere risk that their credit reports would be provided to third-party businesses. Therefore, the 6,332 plaintiffs' argument for standing for their damages claims based on an asserted risk of future harm is unavailing.

Id. at 437.

Here, Plaintiffs bring a multitude of claims based on the BPO products they purchased and an alleged economic harm that occurred based on that the products purportedly degrade into benzene. In other words, the basis for each claim is the actual BPO product purchased by each Plaintiff and how it did not conform to that party's expectations. Identical claims based on products not purchased seems to contradict that "standing is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek (for example, injunctive relief and damages)." Davis, 554 U.S. at 734. A plaintiff must "demonstrate standing separately for each form of relief sought." Friends of the Earth, 528 U.S. at 185. Hypothetically, if there were a Walgreens BPO product that no Plaintiff here had purchased, it makes little sense to allow the named Plaintiffs to sue on behalf of a product that never even allegedly harmed them. Where would courts draw the line? This is not about the Court kicking out meritorious claims from the outset (which appear to be easily cured by

including relevant named plaintiffs), but respecting bounds of Article III.

Furthermore, other district courts have also noted, in similar contexts, that there is a traceability issue with the "substantially similarity" approach. "The similarity of a product, by itself, says nothing about whether a party suffered an injury traceable to the allegedly wrongful conduct of another. A plaintiff who is falsely led to buy a product may claim injury resulting from that purchase; the same plaintiff, however, cannot claim injury from similarly false advertising upon which he or she did not injuriously rely (by buying a similar product or otherwise)." Lorentzen, 532 F. Supp. 3d at 909.

With all this said, the Court again acknowledges that other courts in this Circuit have taken divergent approaches, which only further calls Melendres into question. See Cordes, 2018 WL 6714323, at *5. Therefore, in the alternative, the Court will recommend that this issue be addressed at class certification.

The Court will recommend granting this portion of Walgreens' motion to dismiss. In the alternative, the Court will recommend that this issue be addressed as class certification.

**F. Equitable Relief**

Walgreens argues that Plaintiffs have not shown and cannot show that an adequate legal remedy is unavailable. (ECF No. 54, pp. 21-23.) Thus, Walgreens argues that Plaintiffs are precluded from obtaining any equitable relief. (Id.) Plaintiffs respond that they have pleaded their equitable claims in the alternative, and thus, it would be premature to dismiss the claims. (ECF No. 57, pp. 24-25.) At the pleadings stage, the Court agrees with Plaintiffs.

The parties have provided a slew of cases where district courts either dismissed equitable relief claims at a motion to dismiss where legal claims were available or did not. Compare Duttweiler v. Triumph Motorcycles (America) Ltd., No. 14-cv-04809-HSG, 2015 WL 4941780, at*8-*9 (N.D. Cal. Aug. 19, 2015) (finding that where a legal remedy exists, a plaintiff may not plead equitable relief in the alternative) with Jeong v. Nexo Financial LLC, No. 21-cv-02392-BLF, 2022 WL 174236, at *27 (N.D. Cal. Jan. 19, 2022) (noting no controlling authority regarding pleadings in the alternatives regarding legal and equitable relief and holding that a plaintiff may proceed past a motion to dismiss with alternative theories). This Court finds the

view of allowing equitable pleading in the alternative to proceed to be better supported by precedent and the Federal Rules of Civil Procedure. Rules 8(d)(2), (3) provide:

> ***Alternative Statements of a Claim or Defense.*** A party may set out 2 or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones. If a party makes alternative statements, the pleading is sufficient if any one of them is sufficient.
>
> ***Inconsistent Claims or Defenses***. A party may state as many separate claims or defenses as it has, regardless of consistency.

Moreover, Rule 8(e) provides:

> ***Construing Pleadings.*** Pleadings must be construed so as to do justice.

Thus, pleadings in the alternative are contemplated the Federal Rules of Civil Procedure and may even be inconsistent. And since the Court is tasked with construing complaints so as to do justice, the Court agrees with Plaintiffs that it would be premature at this juncture to dismiss the equitable claims here. To be sure, it will almost certainly become evident at a later stage of the litigation whether actual legal damages are in play thereby necessarily clarifying which claims and relief remain viable. But that is for a later day.

Therefore, the Court will recommend denying this aspect of Walgreens' motion to dismiss.

**G. Standing for Injunctive Relief**

Walgreens essentially argues that Plaintiffs lack standing to pursue injunctive relief because "Plaintiffs make no allegation they might be harmed in the future from the BPO Products." (ECF No. 54, p. 24.) Plaintiffs respond that they have sufficiently alleged standing for injunctive relief, citing to Davidson. (ECF No. 57, p. 25.) The Court agrees with Plaintiffs.

As expounded upon in Davidson v. Kimberly-Clark Corp., a plaintiff must demonstrate constitutional standing separately for each form of relief requested. 889 F.3d 956, 967 (9th Cir. 2018), citing Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC) Inc., 528 U.S. 167, 185 (2000). For injunctive relief, which is a prospective remedy, the threat of injury must be "actual and imminent, not conjectural or hypothetical." Summers v. Earth Island Inst., 555 U.S. 488, 493 (2009). In other words, the "threatened injury must be certainly impending to constitute injury in

fact" and "allegations of possible future injury are not sufficient." Clapper v. Amnesty Int'l USA, 568 U.S. 398, 409 (2013) (internal quotation marks and alteration omitted). Past wrongs, though insufficient by themselves to grant standing, are "evidence bearing on whether there is a real and immediate threat of repeated injury." City of Los Angeles v. Lyons, 461 U.S. 95, 102 (1983) (internal quotation marks omitted). Where standing is premised entirely on the threat of repeated injury, a plaintiff must show "a sufficient likelihood that he will again be wronged in a similar way." Id. at 111. In determining whether an injury is similar, courts "must be careful not to employ too narrow or technical an approach. Rather, [courts] must examine the questions realistically: [courts] must reject the temptation to parse too finely, and consider instead the context of the inquiry." Armstrong v. Davis, 275 F.3d 849, 867 (9th Cir. 2001), *abrogated on other grounds by* Johnson v. California, 543 U.S. 499 (2005).

In resolving a split among district courts, the Davidson Court held "that a previously deceived consumer may have standing to seek an injunction against false advertising or labeling, even though the consumer now knows or suspects that the advertising was false at the time of the original purchase, because the consumer may suffer an 'actual and imminent, not conjectural or hypothetical' threat of future harm." 889 F.3d at 969, quoting Summers, 555 U.S. at 493. Importantly, "[k]nowledge that the advertisement or label was false in the past does not equate to knowledge that it will remain false in the future." Id. at 969-70. "In some cases, the threat of future harm may be the consumer's plausible allegations that she will be unable to rely on the product's advertising or labeling in the future, and so will not purchase the product although she would like to." Id. at 970. "In other cases, the threat of future harm may be the consumer's plausible allegations that she might purchase the product in the future, despite the fact it was once marred by false advertising or labeling, as she may reasonably, but incorrectly, assume the product was improved." Id.

Plaintiffs have alleged that they both relied upon Walgreens' representations and warranties when purchasing their BPO products and "understood them as representations and warranties by Defendant that the product was properly manufactured, free from defects, and safe for its intended use. (ECF No. 46-2, ¶¶ 14-17.) Plaintiffs also allege that they "relied on these

representations and warranties in deciding to purchase the BPO Product and these representations and warranties were part of the basis of the bargain in that she would not have purchased, or would have paid less for, the BPO Product, if she had known of the omissions that the BPO Product was not, in fact, properly manufactured, free from defects, or safe for their intended use." (Id.) That said, "Plaintiffs, in the future, would be willing to purchase the Products, if assured that they were not adulterated and complied with federal manufacturing and holding standards." (Id. at ¶ 19.) This seems to comport with the Ninth Circuit's first example in Davidson noted above.

Walgreens' attempts to distinguish Davidson, arguing that "it is implausible that Plaintiffs, operating under this (mistaken) belief, would ever purchase the BPO Products again, foreclosing any risk of future harm." (ECF No. 54, p. 24.) However, this logic was squarely addressed and rejected in Davidson. "Knowledge that the advertisement or label was false in the past does not equate to knowledge that it will remain false in the future." 889 F.3d at 969-70.

Once more, Plaintiffs have alleged that BPO degrades into benzene (either as a direct result of violation of cGMPs or otherwise). Plaintiffs allege that other formulations are available that could curb the degradation, Walgreens continues to sell its BPO products without warning, and therefore, injunctive relief is necessary. Assuming Plaintiffs allegations are true, Plaintiffs would have no way to know whether in the future Walgreens' BPO products contained benzene (outside of independently testing every bottle they purchase).

For the foregoing reasons, the Court will recommend denying this aspect of Walgreens' motion to dismiss.

**VI.**

**CONCLUSION AND RECOMMENDATION**

Based on the foregoing, IT IS HEREBY RECOMMENDED that Defendants' motion to dismiss (ECF No. 13) be GRANTED as follows:

1. The motion to dismiss as to that Plaintiffs have standing to sue only on behalf of products they actually purchased be GRANTED;

   a. In the alternative, the issue of whether Plaintiffs may represent class members

who did not purchase the BPO products Plaintiffs purchased be resolved at class certification;

2. The motion to dismiss as to the label "Walgreens Pharmacist Recommended" be GRANTED without leave to amend; and

3. The motion to dismiss be otherwise DENIED.

These findings and recommendations are submitted to the district judge assigned to this action, pursuant to 28 U.S.C. § 636(b)(1)(B) and this Court's Local Rule 304. **Within fourteen (14) days** of service of this recommendation, any party may file written objections to these findings and recommendations with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."

Absent leave of the Court, any objections shall not exceed **twenty (20) pages** and, absent good cause and leave of the Court, shall be limited to arguments previously presented by the parties or ruled upon by the Court, and shall not cite any new authority which could have been cited at the time of the filing.

The district judge will review the magistrate judge's findings and recommendations pursuant to 28 U.S.C. § 636(b)(1)(C). The parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal. Wilkerson v. Wheeler, 772 F.3d 834, 839 (9th Cir. 2014), citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991).

IT IS SO ORDERED.

Dated: **August 13, 2026**

STANLEY A. BOONE
United States Magistrate Judge